# EXHIBIT 5

1

1             1

2     UNITED STATES DISTRICT COURT

3     EASTERN DISTRICT OF NEW YORK

4  _____

5 EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

6        Plaintiff,

7   - against -

8 TOWN OF HUNTINGTON AND YOUTH DEVELOPMENT RESEARCH
  INSTITUTE, INC.,

9

        Defendants.

10 _____

11

12

13

14

     DEPOSITION OF JANINE SALGADO

15

      Garden City, New York

16

     Thursday, September 7, 2006

17

18

19

 Reported by:

20 MICHELE ROSSI, RPR

21

22

23

24

25

2

1                                        2

2

3                       September 7, 2006

4                       10:00 a.m.

5

6

7

8              DEPOSITION of JANINE SALGADO, held

9      at the offices of BOND, SHOENECK & KING,

10     PLLC, 1399 Franklin Avenue, Suite 200, Garden

11     City, New York 11530-1679, before

12     Michele Rossi, a Registered Professional

13     Reporter and Notary Public within and for the

14     State of New York.

15

16

17

18

19

20

21

22

23

24

25

30

1                    Salgado              30

2     A    Yes.

3     Q    And you've read these policies?

4     A    Yes.

5     Q    Is knowledge of these policies necessary

6  to any function that you perform in your job?

7          MR. CLARK:  Object to the form.

8     Q    You can answer, if you understand the

9  question.

10    A    Yes.  I mean, in the big scheme of

11 things, yes, anything is bound to happen.

12    Q    I'm not clear --

13    A    Well, we have a suicide policy, I need

14 to know it, although the circumstance often

15 doesn't exist.

16    Q    In your function, in how you function?

17    A    In my function.

18    Q    Have you ever been involved in any type

19 of investigation of any type of grievance since

20 you've been at the Youth Research Institute?

21    A    Not an investigation.

22    Q    What were you involved in?

23    A    In May of 2003, the Sanctuary staff was

24 complaining of unhappiness with their supervisor.

25 And in the absence of their supervisor who was on

31

1                    Salgado              31

2   vacation, I created a forum for them to speak.

3       Q    Who was the absent supervisor?

4       A    Patsy Hirschhorn.

5       Q    Where was she?

6       A    On vacation.

7       Q    Does Patsy Hirschhorn report to you?

8       A    No.

9       Q    Who does Patsy Hirschhorn report to, if

10  you know?

11      A    Maria Georgiou.

12      Q    Who was the supervisor that the staff in

13  Sanctuary in May of 2003 was complaining about?

14      A    Anthony Zenus.

15      Q    Did the staff come to you instead of

16  Patsy Hirschhorn?  So the staff came to you, is

17  that how it worked?

18      A    Yes.

19      Q    Why did they do that?

20           MR. CLARK:  Object to the form.

21      Q    Do you know why they did that?

22      A    I had known them.  I mean, we were

23  friendly, and I think that they felt that I was a

24  neutral party, a new ear, someone that they can

25  confide in.

# EXHIBIT 6

1

1

2    UNITED STATES DISTRICT COURT

3    EASTERN DISTRICT OF NEW YORK

4
     - - - - - - - - - - - - - - - - - - - -x
5    EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

6                    Plaintiff,

7
          -against-
8
     TOWN OF HUNTINGTON and HUNTINGTON YOUTH
9    BUREAU YOUTH RESEARCH INSTITUTE, INC.,

10                   Defendants.

11   - - - - - - - - - - - - - - - - - - - -x

12

13           DEPOSITION of TIMOTHY P. SWEENEY, a

14   third-party witness, taken by Defendants, held at the

15   offices of Bond, Schoeneck & King, PLLC, 1399 Franklin

16   Avenue, Garden City, New York, on Thursday, September

17   14, 2006, commencing at 2:36 p.m., before Jean Wilm, a

18   Registered Professional Reporter, Certified LiveNote

19   Reporter and Notary Public within and for the State of

20   New York.

21

22

23

24

25

```
                                                              2

 1

 2

 3    A P P E A R A N C E S:

 4          EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
                   Attorneys for Plaintiff
 5                 33 Whitehall Street, Fifth Floor
                   New York, New York 10004-2112
 6
             BY:   MONIQUE J. ROBERTS, Esq.
 7

 8          Messrs. BOND, SCHOENECK & KING, PLLC
                   Attorneys for Defendant Huntington
 9                      Youth Bureau Youth Research
                        Institute, Inc.
10                 1399 Franklin Avenue, Suite 200
                   Garden City, New York 11530-1679
11
             BY:   ERNEST R. STOLZER, Esq.
12

13    PRESENT:

14    JANIE SCHMIDT

15

16

17

18

19

20

21

22

23

24

25
```

15

```
 1                        Sweeney

 2    terminated, so it was after that.  It had to be, I

 3    want to say, November of 2003.

 4              Q     And do you recall whether you spoke

 5    by phone, in person?

 6              A     No, we spoke by phone.

 7              Q     And who initiated that call?

 8              A     I don't remember, to be honest with

 9    you.  I think she called me.

10              Q     Prior to November of 2003 when

11    Ms. Lamberg called you, when was the time prior to

12    that you had spoken to her?

13              A     Rita, she had left the youth bureau

14    because she retired in June of '03.  It was

15    definitely June because it was the end of the

16    school year, and I was invited to go to her, you

17    know, parting dinner that everyone went to.

18              Q     And on this occasion in November of

19    2003 when Ms. Lamberg called you, do you recall

20    what she was calling you about?

21              A     She called me -- she called me

22    because she was outraged that -- she was upset

23    that Janie was terminated, as were a lot of

24    people.

25              Q     Did she indicate to you how she
```

```
                              Sweeney
 1
 2    learned that Ms. Schmidt had been terminated?

 3              A    I don't recall.

 4              Q    Do you recall your conversation with

 5    Ms. Lamberg on that occasion?

 6              A    Yeah, I do remember getting into a

 7    conversation because I did work with Mr. Zenkus

 8    and Ms. Schmidt at the same time.  We were all

 9    housed in the same office.

10              And I said to Rita that I thought it

11    was ironic that this happened because I remember

12    when Janie was -- went from project -- they called

13    it Project Excel, from Excel to Sanctuary, and I

14    remember Anthony commenting that, you know, he

15    didn't think it was appropriate or he didn't agree

16    with Jeanette Meyers' decision to hire Janie

17    because he thought Janie was older and that

18    these -- you know, these runaways or street kids

19    may have a difficult time relating to her because

20    of her age.

21              And he went on to, you know, comment

22    about people who have been successful in the

23    position, people like Jody Cottrone, who at the

24    time when she had the position was probably like

25    24, 25.  This is a long time ago.  I believe Cory
```

17

1                         Sweeney

2    Musco had that position.  And they were all, you

3    know, younger people in their twenties.

4         Q     And did Ms. Lamberg say anything in

5    response to that?

6         A     She said, "Well, did you tell Janie

7    that?"

8               I said, "No."

9               She said, "Why not?"

10              I said, "Well, I'm not going" --

11   when that was said, it wasn't my place to go back

12   and tell Janie because I'm not going to hurt her

13   feelings.  I mean, it was uncomfortable.  I'm not

14   going back and carry tales.

15              But then Rita said, "Well, I'm going

16   to tell her."

17              I would say a few weeks or so later,

18   Janie called me and said, "Is it true that Anthony

19   said that?"

20              I said, "Yeah, we spoke together.

21   As far as I remember, it was in private, and we

22   were both housed in the youth bureau at that

23   time," so ...

24        Q     And about what time was that that

25   Mr. Zenkus said that to you?

# EXHIBIT 7

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

------------------------------------------------------------------------X

JANIE E. SCHMIDT,

Claimant,

-against-

TOWN OF HUNTINGTON, HUNTINGTON YOUTH
BUREAU YOUTH RESEARCH INSTITUTE, INC.
and ANTHONY ZENKUS,

Respondents.

**AFFIDAVIT OF
JANIE E. SCHMIDT**

Charge No.

------------------------------------------------------------------------X

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF SUFFOLK      )

**JANIE E. SCHMIDT,** being duly sworn, deposes and says:

### *THE PARTIES*

1.      I am presently a 58-year old, female citizen of the United States.  At all relevant times, I have been a citizen of the State of New York, and have resided at 4 Oxbow Court, East Northport, New York 11731.

2.      Upon information and belief, respondent Town of Huntington is a municipal corporation organized under the laws of the State of New York, with offices located at Town Hall, 100 Main Street, Huntington, New York 11743.

3.      Upon information and belief, respondent Huntington Youth Bureau Youth Research Institute, Inc. ("the Youth Bureau") is a New York corporation with offices located at 423 Park Avenue, Huntington, New York 11743.

4.      Upon information and belief, respondent Anthony Zenkus is a resident of the County of Suffolk.

EEO5

RECEIVED
MAY 2 5 2004
EEOC-NYDO-CRTU

## *OVERVIEW OF CLAIMS*

5.     I have been forced to come to the EEOC to seek redress because my career was abruptly terminated by Anthony Zenkus, my thirty-eight year old supervisor who, I now know, had expressed his opinion that I was too old to perform my job even before he was placed in a supervisory position over me.  With the support and approval of his superiors, Mr. Zenkus ultimately succeeded in firing me on September 25, 2003 under the guise of scheduling a meeting to discuss a performance evaluation.

6.     As I describe in more detail below, I worked at the Youth Bureau for more than 13 years, beginning in 1990.  In December 2002, Mr. Zenkus was hired as my direct supervisor, at which time he immediately began a campaign of discrimination against me.  It was apparent from the beginning that Mr. Zenkus had a discriminatory animus toward me, and that he ultimately fired me because I complained about his conduct and refused to heed his express warnings not to speak with his superiors about his conduct.

7.     Remarkably, I have since learned that Mr. Zenkus' animus toward me dates back to approximately 1999 when Mr. Zenkus and I were both working at the Greenlawn Youth Directions and Alternatives.  At that time, Mr. Zenkus told a then-colleague, Timothy Sweeney, that I was too old to work with the Youth Bureau population (12-21 year olds) who purportedly would not be able to relate to me.   (A copy of an affidavit given to me by Mr. Sweeney is attached as a separate exhibit to this affidavit.)   It was not until Mr. Zenkus became my direct supervisor in December 2002 that he was in a position to finally use his authority to get rid of me.   As a result, I am seeking relief for Respondents' discriminatory and retaliatory conduct toward me.

EEO6

RECEIVED

MAY 2 5 2004

EEOC-NYDO-CRTU

2

### *STATEMENT OF CLAIMS*

8.      I began working at the Youth Bureau in January 1990 as an employment counselor for Project Enterprise/Excel. In November 1999, I applied for and was hired by Project Sanctuary (still within the Youth Bureau) as an Independent Living Skills Counselor. My general job duties and responsibilities in that position were to teach independent living skills and provide crisis intervention, case management and counseling services to at-risk and homeless youth.      Over the years, I continuously received accolades and positive performance reviews both from my supervisors and from those within the school districts within which I conducted various programs.

9.      Mr. Zenkus was hired to be the Project Sanctuary Director at the Youth Bureau in December 2002.  At the time, there were two other full-time counselors at Sanctuary (in addition to me), both of whom were in their 20s.  There also was a part-time female employee in her thirties, who conducted parenting skills workshops.  We all reported directly to Mr. Zenkus.

10.      Almost immediately after Mr. Zenkus became my supervisor, his tone and overall demeanor toward me in particular were demeaning and hostile, and he began treating me differently than other, younger employees with whom Mr. Zenkus tried to have a more friendly and social relationship.  Mr. Zenkus isolated me from most social conversations, and frequently called my younger colleagues at home to ask them to meet him at local bars, invited them to various locations to hear his musical band, and told them that they should "hang out" with different project personnel who were "young and motivated."

11.      On January 29, 2003, Mr. Zenkus placed a memorandum in my mailbox, which provided a job description for my position as Independent Living Skills

EEO7

3



MAY 2 5 2004

EEOC-NYDO-CRTIU

Counselor, as well as an identification of specific dates on which I was required to complete certain tasks. A copy of the memorandum was given to Patsy Hirschhorn, the Youth Project Director at the Youth Bureau, an employee of the Town of Huntington, and Mr. Zenkus' direct supervisor. Prior to issuing the memorandum, Mr. Zenkus never spoke to me about the subject matter of the memo, which changed much of the nature of my position. I was the only person at Sanctuary to receive such a memorandum at that time.

12.     Feeling singled out, I went to speak with Ms. Hirschhorn to discuss the situation, at which time I advised Ms. Hirschhorn that I was offended at being the only person to receive Mr. Zenkus' memorandum without prior discussion, and also was offended by the hostile and demeaning tone of the memorandum and the way Mr. Zenkus spoke with me generally. Ms. Hirschhorn told me that she would speak with Mr. Zenkus about my concerns.

13.     The very next day, Mr. Zenkus called me into his office. As soon as I walked in, Mr. Zenkus sat back in his chair and threw his pencil on his desk. He told me that he was furious with me, and warned me never to speak with his superiors about him again. Mr. Zenkus continued to badger me about my prior conversation with Ms. Hirschhorn, continuously asking me if I heard and understood him.

14.     I began to experience a rapid heartbeat and feel physically uncomfortable. When I stood up and explained my discomfort to Mr. Zenkus, he demanded that I sit down. I responded at that time by stating that I was experiencing a rapid heartbeat as a result of his angry and threatening tone and could not sit down, yet Mr. Zenkus nevertheless stared at me and stated: "I said sit down." Feeling ill, I had to leave his office.

15.     Later that same week, Mr. Zenkus distributed a "joint" memorandum to the other two project counselors, having already spoken with them individually prior to

EEO8

4



sending their memo.  In addition, and contrary to the substance of the memorandum he issued to me, Mr. Zenkus told the other counselors that their task dates were only "targets," and that he required only that they make an effort to meet the task dates.

16.     Approximately two weeks later, I met with Ms. Hirschhorn and Mr. Zenkus to discuss what had transpired in his office a couple of weeks prior.  I complained to Ms. Hirschhorn at that time about the hostile and disparate treatment Mr. Zenkus had been exhibiting toward me, and that I felt threatened by his warning me not to speak with his superiors again.  I also complained to Ms. Hirschhorn that Mr. Zenkus was clearly treating me differently than the other, younger individuals in the office.

17.     Mr. Zenkus then stated that he wanted to place a "memorandum of warning" in my file for leaving his office, but Ms. Hirschhorn responded that such a memo was not necessary.   Toward the end of the meeting, Mr. Zenkus stated that if I did not think that I could work for him, then I should "do what [I] have to do."

18.     After that meeting, Mr. Zenkus' tone and demeanor toward me deteriorated noticeably, in apparent retaliation for my speaking with Ms. Hirschhorn and Ms. Hirschhorn's refusal to permit him to place a written memorandum in my file.

19.     Remarkably, however, six days after that meeting, Mr. Zenkus called me into his office again and told me that he was still "writing me up" and placing it in my personnel file.  I told Mr. Zenkus that I wanted Ms. Hirschhorn to be present because Ms. Hirschhorn specifically instructed Mr. Zenkus not to write me up.  Ms. Hirschhorn came into Mr. Zenkus' office and repeated her advice that he should not place any memorandum of warning in my file.

EEO9



5

20.     Mr. Zenkus' hostility and disparate treatment toward me in the office escalated over the course of the next two months.  For example, during the first week of April 2003, I had a supervisory session with Mr. Zenkus, at which time we discussed the fact that I would be required to perform "street outreach" alone.   Street outreach entails randomly approaching youth (who are possibly at-risk or homeless) with the intent of telling them about the services offered by Sanctuary and inquiring if they might be in need of any of those services. I mentioned at that time that Mary Lou Kallman, the prior Youth Bureau Grants Writer, previously told me that street outreach was never meant to be done alone because it was considered potentially dangerous.  Mr. Zenkus responded that he was requiring that I do street outreach, but since there may be times that I would have to do it alone, he would investigate whether there were any specific policies against that practice and get right back to me.

21.     Nevertheless, on April 15, 2003, Mr. Zenkus placed a memorandum of warning in my file, stating that I was insubordinate for purportedly failing to perform street outreach as directed.  I was particularly surprised by that memorandum because Mr. Zenkus never got back to me regarding the safety policies, and given that Mr. Zenkus never gave me the slightest indication or warning at the prior supervisory session that I was being insubordinate.

22.     It was clear, once again, that Mr. Zenkus was setting me up during that early April supervisory session to concoct a reason to place a warning memo in my file, after Ms. Hirschhorn had not allowed him to do so previously.  Mr. Zenkus' April 15th memorandum, and his behavior toward me during that period of time, was consistent with his general hostile treatment of me in relation to the other workers at Sanctuary, and consistent with his overall efforts to retaliate against me for complaining to his supervisors.

EEO10



RECEIVED
MAY 2 5 2004
EEOC-NYDO-CRTIU

6

23.     Thereafter, on April 23, 2003, I met with Maria Georgiou, the Executive Director of the Youth Bureau and an employee of the Town of Huntington.   I described to Ms. Georgiou the history of Mr. Zenkus' conduct since he became my supervisor, including the blatant acts of harassment, retaliation, and discriminatory animus he exhibited toward me.  I specifically complained to Ms. Georgiou about being treated differently than the younger staff.   Ms. Georgiou said that she would look into the matter and talk with Mr. Zenkus.  Ms. Georgiou added that, while it may be necessary on occasion to perform street outreach alone, she agreed that any such street outreach should be done in a safe manner.

24.     I accepted Ms. Georgiou's explanation of the street outreach requirements, and further expressed my willingness to continue to try to work with Mr. Zenkus.  I requested that Ms. Georgiou remove Mr. Zenkus' April 15th memorandum from my file, and Ms. Georgiou responded by stating that she would consider my request.

25.     However, Mr. Zenkus' April 15th memorandum was not removed from my file.  Consequently, I sent Ms. Georgiou a letter dated May 8, 2003 (with a copy to Ms. Hirschhorn), in which I expressed how unfair and misleading Mr. Zenkus' memorandum was, and tried to "complete the picture" by summarizing Mr. Zenkus' history of hostility and discriminatory treatment. I ended my May 8th letter by stating: "I have worked hard for the past 12 years to earn my reputation and to have a personnel file of which I am proud.  I certainly do not want to further ignite any hostile feelings Mr. Zenkus already has toward me, and I am fully prepared to continue to work for him as long as his abusive, demeaning and retaliatory behavior stop."

26.     Immediately after delivering that May 8th letter, and continuing through September 2003, Mr. Zenkus ignored me in the office, and greeted me only when it was

EEO11

7



completely necessary or unavoidable. On August 12, 2003, Mr. Zenkus gave me a memorandum requiring me to perform street outreach at the Onesti Motel, a homeless facility in Huntington. Despite the fact that that location had well-publicized incidents involving drug transactions, violence and mental illness residents, Mr. Zenkus made it clear in subsequent conversations that I would have to go to the Onesti Motel, even if it meant that I would have to go there alone.

27.     In an effort to avoid being cited again for insubordination, and despite the clear safety risks in which I was being directly placed, I performed outreach at the Onesti Motel, and also met clients alone at the Allison Court shelter.

28.     On August 25, 2003, Mr. Zenkus asked me for the first time to type bullet points summarizing a project I just completed for him. I told Mr. Zenkus that I was not completely proficient in typing, and then asked if the secretary could type my handwritten points as she often did. Mr. Zenkus called me into his office the next day and directed me to obtain a "typing course," either by downloading one from the Internet, or by purchasing one. After having reflected on the issue, I then qualified my prior statement by noting that I did not have problems typing, but that I was less proficient in Microsoft Word. While I routinely rostered clients in Sanctuary's computer database over the years, I rarely had to use Microsoft Word or otherwise type lengthy memos.

29.     At that point, Mr. Zenkus began mocking me and saying repeatedly, "First you say you can't type, now you say you can type – which is it?" Mr. Zenkus continued to badger me, at one point threatening to give me a typing test on the spot. One week later on September 3, 2003, and despite my clarification, Mr. Zenkus wrote yet another memorandum to me, with a copy sent to Ms. Hirschhorn, stating that I had to work on my typing skills. I responded in a (typed) memorandum, by again stating that it was my proficiency with Microsoft

EEO12

8



Word that could benefit from additional training, not my typing skills generally, and that I was in fact currently working to improve my computer skills as he had demanded.

30.     Two weeks later, Mr. Zenkus hand delivered a written performance evaluation to me dated September 17, 2003.   The evaluation was the first formal, written evaluation that Mr. Zenkus had ever given to me, and identified several areas that clearly reflected a biased, retaliatory appraisal.   Indeed, it was the first time in 13 + years that I had received any performance appraisal that was so nonconstructive and blatantly pretextual.

31.     However, Mr. Zenkus assured me at that time that the evaluation had not yet been filed, and that he would consider changing anything that I could support as being incorrect.  As a result, by letter dated September 17, 2003, I provided a detailed response to the evaluation, in which I noted my belief that the evaluation was unfair and failed to "objectively reflect my true performance during the appraisal period."  I concluded my letter by stating: "In light of what I have explained, I believe a reconsideration of your assessment of my performance is warranted."

32.     Mr. Zenkus made an appointment to meet with Ms. Hirschhorn and me on September 25, 2003, telling me that it was for the purpose of discussing Mr. Zenkus' evaluation and my response.

33.     On September 25, 2003, I met with Mr. Zenkus and Ms. Hirschhorn as planned.   However, rather than discussing my evaluation as promised, I was fired.   I was told that the reason for my termination was that the number of clients I was seeing was low.   That reason was completely false, and an obvious fabrication created to hide the fact that Mr. Zenkus had finally succeeded in getting rid of me because he believed I was too old and because I complained too much about his behavior toward me.  Indeed, the number of my rostered clients

EEO13

9



as of September 2003 was 49, while the two other, younger counselors at Sanctuary had rostered 29 and 33 clients respectively.

34.      I was extremely emotional at having been unexpectedly fired from a job that I worked at and loved for more than 13 years.  To make matters worse, I was told at the end of the meeting on September 25th that I had to quickly gather my belongings and leave the office immediately.

35.      I understand that federal and state law prohibit Respondents from discriminating against me because of my age, firing me because of my age, and retaliating against me because I complained about that discriminatory treatment.  In addition, I relied upon the Youth Bureau's Personnel Practices handbook, which states among other things that: "No worker will be discriminated against, harassed, intimidated or made to suffer any reprisal as a result of filing a grievance or participating in the investigation of such a grievance."

36.      At the end of the day, I believe that the circumstances up to and including the termination of my employment on September 25, 2003 establish that my age was a motivating factor in the decision to fire me, and that I was retaliated against because I refused to heed Mr. Zenkus' warnings not to complain to his superiors, in violation of the federal Age Discrimination in Employment Act, the New York Human Rights Law, and the Youth Bureau's own internal grievance procedure.[1]

37.      Mr. Zenkus' conduct was condoned and accepted by his supervisors at the Youth Bureau and the Town of Huntington, who ultimately approved my unlawful

EEO14

---

[1]      Although I understand that the EEOC may not be the forum in which to address issues pertaining to unpaid overtime compensation, I have been informed that I was inappropriately given compensatory time in lieu of overtime by the Youth Bureau (a private entity), and that I was not paid for all hours I actually worked as of the date of my termination, all in violation of the federal Fair Labor Standards Act and New York state law.

MAY 2 5 2004

EEOC-NYDO-CO710

termination.   Despite numerous complaints, no effective investigation took place and no action was taken to remediate the discriminatory acts against me.

38.   I have been a devoted, hard working employee, whose experience, knowledge, and ability to empathize, interact and counsel my clients has resulted in an exemplary record of performance over the course of my 13 + years of employment.   As a direct result of the above discrimination and retaliation, I have suffered and continue to suffer substantial damages.

39.   I respectfully request that the EEOC make a finding that respondents have engaged and are engaging in unlawful discrimination and retaliation prohibited by law, that I be given all benefits and compensation to which I am entitled, including compensatory and punitive damages, and that I be awarded all of my costs, expenses and all reasonable attorneys' fees incurred as authorized by law, together with such other and further relief as the EEOC deems just and appropriate.

40.   I have not previously filed a charge/complaint with any state or local civil rights agency based on the same discriminatory actions discussed in this charge.


Under penalty of perjury, I swear that the above is true and correct to the best of my knowledge, information and belief.

_____
Janie E. Schmidt

Sworn to before me this
_9th_ day of May 2004                                                                    EEO15

_____
Notary Public

MICHAEL C. SCHMIDT
Notary Public, State Of New York
No. 02-SC5048598
Qualified In Suffolk County
Commission Expires __8/28/05__

RECEIVED
MAY 2 5 2004
EEOC-NYDO-CRTU

11

# EXHIBIT 8

# AFFIDAVIT

**STATE OF NEW YORK** )
                       ) ss.:
**COUNTY OF** Suffolk )

       **TIMOTHY P. SWEENEY,** being duly sworn, deposes and says:

       1.     In October of 1999, Ms. Janie Schmidt, Anthony Zenkus and I were all working at the Greenlawn site of Youth, Directions and Alternatives ("YDA"). Mr. Zenkus was an employee of the YDA. Ms. Schmidt and I were outreach workers of projects of the Huntington Youth Bureau system. It was during this time that Ms. Schmidt announced that she was transferring from Project Excel to Project Sanctuary to take on the position of Independent Living Skills Counselor for runaway and homeless youth. Project Sanctuary services youth who are ages 12 to 21. Ms. Schmidt announced that she would be occupying her new position as of November 1, 1999.

       2.     It was shortly after this announcement by Ms. Schmidt that Mr. Zenkus commented to me, in private, that he was not in agreement with Jeannette Meyers' decision to hire Ms. Schmidt as an Independent Living Skills Counselor because she was too old for the clients to relate to and that she would be ineffective as such. Mr. Zenkus added that that position needed a much younger individual to be effective in that role. He went on to compare Ms. Schmidt to younger counterparts (all in the age range of 22 to 29) who had previously held that position and commented that she would fail in comparison due to, what Mr. Zenkus perceived to be, her advanced age.

TIMOTHY P. SWEENEY

Sworn to before me this
24 day of February 2004

Notary Public

Mark Andrew Lonergan
Notary Public, State of New York
No 01LO6019061
Qualified in Suffolk County
Commission Expires February 2, 2007

2/24/04

EEO99



# EXHIBIT 9

# Memorandum

**To:**    Jennifer Grosser and Lizabeth Graeve

**CC:**    Patsy HIrschhorn

**From:**   Anthony Zenkus

**Date:**   2/6/2003

**Re:**    Runaway Social Worker and Family Social Worker Positions

---

This is to clarify what is expected of you in your position. If you have any questions on how to implement these things, or need help in any way, please make the time to meet with me so we can discuss ways of ensuring these outcomes.

**Client Caseload:** You should be carrying a case load of **at least** 10 clients who you meet with weekly (including groups) at all times, however the target should be at least 15. These clients must all have individual goals and weekly progress notes, and must be properly rostered. (To achieve the yearly client target, you should be averaging at least 3-4 new admissions monthly). Your caseload should be **substantially increased by 2/28/03.** You may have to increase outreach efforts in both the schools, the CYA, and the community to achieve this goal.

**Groups:** You are expected to run **at least** one on-going group. A group must meet for at least 8 sessions, the average group meeting ideally 8-12 sessions. You may recontract with the group to meet for additional sessions after the initial group ends. At least one group **must begin by the week of 2/24/03.**

**Outreach:** The requirement of performing outreach at the schools at least 2 X weekly and the regional CYA's at least 2 X weekly needs to be maintained, even when you have days off. In order to achieve the above goals, you may find that you need to increase the quantity and intensity of your outreach. Other areas of outreach you may wish to explore may be community based, such as Church youth groups, street outreach, etc.



PLAINTIFF'S EXHIBIT 7A
ZENKUS
7/13/08

1

# EXHIBIT 10

PERSONNEL REFERRAL FO **CONFIDENTIAL**

Account Clerk/Typist at Youth Bureau

To: _Madeline Curry_

From: _Patsy Hirschhorn, Youth Project Director_

THIS FORM IS TO BE USED FOR NEW EMPLOYEES, PRESENT EMPLOYEES BEING TRANSFERRED TO A DIFFERENT POSITION AND/OR PROJECT OR AN INDIVIDUAL WHOSE SALARY IS BEING ADJUSTED.

ACTION (S) DESIRED: HIRING (X) RAISE ( ) SALARY ADJUSTMENT ( ) *

APPROVED BY: _Maria Georgacou_

Executive Director

TRANSFER FROM _____ TO _____

NAME OF INDIVIDUAL: _Jennifer Grosser_

NAME OF REGION/PROJECT: _Sanctuary_   _1,395.83_

(AS PER BUDGET)

POSITION TITLE: _Family Social Worker_

EFFECTIVE DATE: _10|16|02_   FULL TIME S/M RATE _$33,500_

PART TIME: _____ # OF HOURS: _____ HOURLY RATE: _____

per week

ANNIVERSARY DATE: _10|16|03_   RAISE DATE: _10|16|03_

(mm/dd/yy)

(FOR CYA USE ONLY (COMPLETE WHEN THE FORM IS SUBMITTED)

[ ] New Employee has been given copy of Personnel Practices and Hiring Procedures and receipt for same is on file at CYA.

[ ] New Employee has completed an I-9 and the signed form is on file at the CYA.   _✓ me_

[ ] Completed Health Insurance Application has been sent to Maureen Sutherland, administrator for Health Insurance.

NOTE: THIS FORM MUST BE PRESENT AT THE YOUTH BUREAU BEFORE THE INDIVIDUAL COMES TO THE YOUTH BUREAU FOR COMPLETION OF PERSONNEL FORMS AND PRIOR TO BEING PLACED ON THE TIMESHEET. ATTACH A SIGNED W4 FORM.

IT IS THE RESPONSIBILITY OF THE YOUTH BUREAU ADMINISTRATIVE STAFF MEMBER OR CYA TO MAKE CERTAIN THAT THIS FORM IS COMPLETED AND SUBMITTED PRIOR TO THE DATE ON WHICH DESIRED ACTION IS TO BEGIN.

_Position Vacant pH_   _Patsy Hirschhorn_

Regional/Project Director   Youth Services Coordinator or
Youth Project Director

*Necessary only for other than normal anniversary raise.
 A copy of the hiring letter must accompany this form.

Rev: 4/02

5893

## PERSONNEL REFERRAL FORM

**To**                    Account Clerk/Typist at Y~~~~~~  CONFIDENTIAL

**From:**

THIS FORM IS TO BE USED FOR NEW EMPLOYEES, PRESENT EMPLOYEES
BEING TRANSFERRED TO A DIFFERENT POSITION AND/OR PROJECT OR AN
INDIVIDUAL WHOSE SALARY IS BEING ADJUSTED.

ACTION(s) DESIRED:  ( ✓ ) HIRING[*]  ( ) RAISE
     ( ) SALARY ADJUSTMENT   APPROVED BY: _____ Exec.Dir.[1]
     ( ) TRANSFER       FROM _____ TO _____

NAME OF INDIVIDUAL: _Jennifer Grosser_____

NAME OF REGION/PROJECT: ___Sanctuary_____
                  **(AS PER BUDGET)**

POSITION TITLE: _Runaway/Homeless Youth Counselor_

EFFECTIVE DATE: _10/16/01_ FULL TIME S/M RATE $30,000 ANNUALIZED

PART TIME:_____ # OF HOURS: _____  HOURLY RATE: _1,250 s/m_

ANNIVERSARY DATE: ___10/16/01_ RAISE DATE: ____10/16/02_
          **(mm/dd/yy)**             **(mm/dd/yy)**

----------------------------------------------------------

FOR CYA USE ONLY (COMPLETE WHEN THE FORM IS SUBMITTED)

[ ] New Employee has been given copy of Personnel Practices and
Hiring Procedures and receipt for same is on file at CYA.

[ ] New Employee has completed an I-9 and the signed form is on
file at the CYA.

[ ] Completed Health Insurance Application has been sent to
Maureen Sutherland, administrator for Health Insurance.
----------------------------------------------------------*-*-----
NOTE: THIS FORM MUST ACCOMPANY THE INDIVIDUAL WHEN HE/SHE COMES
TO THE YOUTH BUREAU FOR COMPLETION OF PERSONNEL FORMS AND PRIOR
TO BEING PLACED ON THE TIMESHEET. ATTACH A SIGNED W4 FORM.

IT IS THE RESPONSIBILITY OF THE YOUTH BUREAU ADMINISTRATIVE STAFF
MEMBER OR CYA TO MAKE CERTAIN THAT THIS FORM IS COMPLETED AND
SUBMITTED *PRIOR* TO THE DATE ON WHICH DESIRED ACTION IS TO BEGIN.

_Jeannette Meyers_____    _Stacy Cenn_____
Regional/Project Director     Youth Services Coordinator or
                            Youth Project Director

[1]
[*] Necessary only for other than normal anniversary raise.
   A copy of the hiring Letter must accompany this form.

                         **Rev. 3/95**

# EXHIBIT 11

# PROGRAM ANNUAL REPORT
## (See instructions on reverse)

State of New York
OFFICE OF CHILDREN AND FAMILY SERVICES
Form OCFS3140(Front)(Rev 9/98)

Sponsoring Municipality: T HUNTINGTON          Program Code: 04471740T002   Fund: RHYAII

Implementing Agency: HUNT YTH BUR YTH DEV RSCH INST
Program Title:   SANCTUARY-STILS PROGRAM
Agency Address:  423 PARK AVENUE, HUNGTINGTON, NY  11743

Contact Person:  ANTHONY  ZENKUS          Title: PROJECT DIR.
Telephone Number: (516)271-2183

## PROGRAM SITES

| Type | Address | Assembly District | Senate District | Local Plng Board | City Council District |
|------|---------|-------------------|-----------------|------------------|-----------------------|
| OFFICE | 423 PARK AVE<br>HUNTINGTON  11743 | 9 | 2 | | |

## PROGRAM PROFILE

|  | Problem/Need | Target | Service Methods | | Number of Youth to be served | Unduplicated Count |
|--|--------------|--------|-----------------|--|------------------------------|--------------------|
| Primary | 713 | 719 | 560 | 524 | 30 | 45 |
| Secondary | 716 | 719 | 566 | 530 | 30 | |

**STATISTICAL REPORT:** Use only Whole Numbers. Do **NOT** use Percentages.
_____ No direct services provided to youth.

Unduplicated Number of Youth Served: ___45___
Gender: Male _15_   Female _30_
Ethnicity:  White _19_   Black _19_   Hispanic _7_   American Indian _0_
Asian _0_   Other _0_
Age: 0 - 4 _0_   5 - 9 _0_   10 - 15 _5_   16 - 20 _40_

Narrative attached as per instructions on Reverse:  Yes _x_   No ____

**MONITORING** - Describe the methods used to monitor this program during the reporting period. Include who conducted the monitoring, when it was conducted, and how the results were used. (Attach additional page if necessary).

PLAINTIFF'S EXHIBIT 55
Hirschborn
8/9/06

PREPARED BY: _(signature)_          TITLE _Youth Project Director_ DATE _2/14/05_
Signature of Program director or designee

CERTIFIED BY: _(signature)_          TITLE _Ex Dir_          DATE _2/15/05_
Signature of Chief Executive Officer
(or designee), or Agency Executive Director if direct contact

1196

# ANNUAL PROGRAM NARRATIVE REPORT

**PROGRAM YEAR: 2004**

**AGENCY:    HYBYDRI SANCTUARY PROJECT-STILS**

1.    **MAJOR ACCOMPLISHMENTS OF THE PROGRAM YEAR,
      INCLUDING STATUS OF OBJECTIVES LISTED IN THE
      CONTRACT.**

Independent Living Skills counseling combined with intensive case management was
provided to 31 youth in 2004. This included resolution of the homeless crisis through
housing advocacy and assisting youth to focus their self-determination towards the
development of problem solving skills, more effective coping skills and other life skills.
Family mediation through the services of the Independent Living Skills counselor was
also utilized to resolve homelessness in appropriate cases. An additional 13 youth
received brief services and 45 benefited Independent Living Skills training through a
series of workshops.

Outreach with other staff from the Huntington Youth Bureau System continued in 2004,
increasingly helping to identify youth in need of Sanctuary services. This comprehensive
involvement with system agencies provides youth with additional assets and enhanced
skills to cope with or improve their home environment. Regular outreach was performed
at schools, in the Community Youth Agencies, and at times on the streets.

The Independent Living Skills Counselor continues to be available to the eight school
districts of the Town of Huntington for crisis intervention with homeless or potentially
homeless youth. This immediate intervention on school grounds provides the youth with
support; information and resources to better evaluate their current situation. Many of
these youth become involved with Sanctuary and with the other programs of the
Huntington Youth Bureau system. Sanctuary maintains an aggressive outreach plan to
identify youth in need of Independent Living Skills training.

2.    **DESCRIBE ANY OBSTACLES OR PROBLEMS, WHICH
      OCCURRED DURING THE PROGRAM YEAR, HINDERING
      PROGRESS TOWARD PROGRAM OBJECTIVES. INCLUDE
      DISCUSSION OF STEPS TAKEN OR PLANNED TO OVERCOME
      THOSE OBSTACLES.**

The Independent Living Skills program met its program objectives in 2004. Extensive
community outreach produced these results, despite a three month vacancy in the
program line following the loss of federal RHY funding.

There continues to be a shortage of housing for the 16 to 21 year old population within
the community. At various times throughout the year, older male adolescents require
emergency housing. Some of these youth refuse a referral to DSS Emergency Housing

valuable support systems and places of employment lessening the opportunity to receive Independent Living Skills training. Some youth express concerns for their personal safety in DSS Housing in which adolescents are housed with adults. Other youth, both male and female, are denied housing through DSS Emergency Services and are left with few options.

3. **DESCRIBE LINKAGES AND WORKING RELATIONSHIPS INITIATED OR CONTINUED, GIVING A SENSE OF THE VALUE OF THESE LINKAGES.**

Sanctuary continues to maintain relationships with all existing linkages. The Sanctuary Project Director served as member of the Board of Directors of the Empire State Coalition of Youth and Families, and the program itself continues to be a member of the National Network for Youth. The Sanctuary Director maintained active membership in the Coalition of Runaway Programs (C.O.R.P.S.) in Suffolk County. The Independent Living Counselor regularly attended DSS Advisory Board meetings.

These linkages are extremely valuable as they provide the opportunity for the Independent Living Skills counselor to share and receive information on homeless youth issues with other groups through the involvement of the entire Sanctuary staff with other groups and organizations. This involvement also helps to develop a more effective, stronger network for advocacy for this population.

The Independent Living Skills Counselor has maintained strong relations with various personnel in the eight school districts in the Town of Huntington, housing resources and other community-based agencies. As a result of these relationships, the Independent Living Skills Counselor has successfully advocated on behalf of youth to attain housing and employment.

4. **NOTE AREAS OF TECHNICAL ASSISTANCE THAT WOULD BE BENEFICIAL TO THE OPERATION OF THE PROGRAM.**

Staff training and travel currently comes from fund-raised or non-OCFS agency income. In order to maintain the level of professionalism and expertise needed to serve these homeless youth, ongoing education through trainings, workshops and seminars are a necessity.

### MONITORING METHODS

The Sanctuary Project Director provided regular, weekly supervision to the Independent Living Skills Counselor. The Project Director monitored case progress, interventions and termination. With the loss of federal funding, these activities were shifted to the Youth Project Director who previously supervised the Sanctuary Project Director.

Data to monitor the STILS program is collected by reports, program observations and monitoring methods. The Independent Living Skills Counselor administers a monitoring

tool assessing the youth's progress on Independent Living Skills Development once a month to clients. The Independent Living Skills Counselor updates treatment/goal plans with the client at designated time frames.

## Sanctuary Advisory Board

Bill Farrell

Christine Biernacki

Jill Sitterley

Christine Matis Uzzo

Rachel O'Connor*

Megan Long*

Aimee Lillienstein*

\* youth members

# EXHIBIT 12

OCFS 2003                                                    SPECIAL PROJECTS

## TOWN OF HUNTINGTON YOUTH BUREAU/YOUTH BOARD

## SPECIAL TOWNWIDE PROJECT FUNDING CATEGORY

2003

## FACE SHEET

1.Project Name:_____ **Sanctuary Transitional Independent Living Skills**

2.Implementing Agency:_____ **HYBYDRI**_____

3.Service Area: (check only one!)

[x] Town of Huntington

[ ] Other (specify area(s) by listing school districts)

Submitted By:

Name/Title_____ **Jeannette Meyers – Project Director**_____

Signature_____ Jeannette Meyers_____

Date_____ July 26, 2002

Requested Amount_____

Word processing program:                                    Hirschhorn Ex#

___WordPerfect
_x_ Microsoft Word for Windows

4

## SANCTUARY TRANSITIONAL INDEPENDENT LIVING SKILLS PROGRAM
## PROGRAM NARRATIVE 2003

### I. STATEMENT OF NEED:

### A. PROBLEM/NEED:

The homeless youth population of 16 to 21 year old exists, even in the supposedly idyllic suburban area of Huntington. Since 1986, when 22 youth received these services for the 5 months the program operated, the number of youth who need these services has continued to rise. In 2001, 44 homeless and at risk youth received intensive case management services. An additional 199 youth received brief service and/or attended workshops on Independent Living Skills. In the first 6 months of 2002, 26 youth received intensive case management services, 5 additional youth received brief services and 44 youth have attended workshops. With continuing and increasing needs being documented in Suffolk County and continued runaway/throwaway youth, there appears to be a never-ending supply for the future. According to the Suffolk County Police Department, Suffolk County reported 1,867 Missing Children (under the age of 18). 33% of these youth were between the ages of 16-17. In the Second Precinct #2 located in the Town of Huntington, 272 youth (under the age of 18) within the town were reported runaway or missing. 21% were between the ages of 16-21. According to the most recent available data, the Town of Huntington ranks fourth out of the County's 10 Townships for teen pregnancies. In the year 2001, the Town of Huntington continues to rank in the top 10 High Impact Hamlets for Juvenile Offenses, PINS placed on probation, Juvenile Delinquents placed on probation, Aid to Families and Dependent Children and Child Abuse and Maltreatment. According to the most recent available data, the Town of Huntington has 3 of its school districts listed in the top county districts with Highest Rate of Drop-outs, Highest number of Limited English Proficient Students and Highest Hispanic Enrollment.

These 16 to 21 year old youth often find themselves without the employment/educational skills or the emotional/psychological maturity to live on their own. They are often pushed or forced out of their homes by families that are overburdened themselves. These youth have histories of feeling separate, and feeling that they are unwanted. In his book, *Working Together For Youth*, Marc Posner writes, "Leaving home is often an escalation of a youth's response to a family in which he or she does not feel comfortable or wanted. In most cases, the responsibility for these conflicts cannot simply be placed on the child. In many homes, patterns of conflict and risk behaviors are passed along from generation to generation. These are children who come from situations of parental neglect and/or abuse, often unintentional yet still damaging. So they leave the confines of their family's home to make it on their own... without the necessary maturity and basic skills to survive".

This homeless population needs concrete services, crisis intervention, and supportive counseling. As demonstrated by the youth sleeping in parks, in cars, and at railroad stations, and the phone calls requesting housing, food, and clothing, there is a need for intervention at all levels. A 1995 research study funded through the Family and Youth Services Bureau (FYSB) reported that once on the street, runaway, throwaway, and homeless youth have trouble meeting basic needs and face a violent

1

environment and other threats to their well-being. There is more than one issue at hand when working with homeless youth. Sanctuary is one of the only agencies in this area that can provide this necessary integration of services. Concrete and crisis needs are met initially by the Independent Living Skills Counselor. This often provides the opportunity for further involvement of the youth with Sanctuary i.e. on-going case management and development of Independent Living Skills, a sense of self-worth and self-esteem.

The Independent Living Skills Counselor is often called upon by referral agencies to meet with a youth who is contemplating leaving home to live on one's own. The counselor is able to explore options with the youth, provide legal information, referrals and in some cases able to mediate with the family to prevent the youth from becoming homeless. Successful mediation cases often serve as the beginning for the family to address escalating issues through counseling such as the Sanctuary Family Social Work program. If we intervene both systemically and with the individual youth themselves, Sanctuary believes that we can impact and perhaps interrupt the cycle and keep our youth and families safe.

## B. TARGET POPULATION:

The target population is homeless and potentially homeless youth, from sixteen to twenty-one years who reside in the Town of Huntington. Huntington Township comprises 14.5% of the county's total population and 13% of its youth population. As per the 2000 census, there are 52,926 youth residing in Huntington with approximately 10,595 youth in between the ages of 15-19.

It is estimated that in 2002, 30 homeless and at risk youth will receive intensive case management services and an additional 15 youth will receive crisis intervention counseling and independent living skills training. In 2001, our clients were 39% male, 61% female, 64% White, 25% Black, and 11% Hispanic.

## C. GEOGRAPHIC AREA/EXISTING SERVICES:

The Sanctuary Project serves the entire Town of Huntington, as does the STILS component. The Town of Huntington is a 94 square mile suburban jurisdiction located in the northwestern corner of Suffolk County.

Sanctuary Project is the only existing service in the Town of Huntington designed specifically to meet the needs of runaway and homeless youth.

2

OCFS 2003                                                    SANCTUARY - STILS

## II. PROGRAM OUTCOME OBJECTIVES:

### A. OBJECTIVES:

**OBJECTIVE 1:** Provide case management services to forty 16 to 21 year old homeless and potentially homeless youth.

As a result, 60% of youth served will demonstrate an increase in self-sufficiency, as measured by observation, case notes, and an evaluation tool (as indicated in the Appendices).

**OBJECTIVE 2:** Provide training in independent living skills, problem solving, decision making and communication skills for at least 70% of these adolescents.

As a result, 50% will demonstrate knowledge of how to advocate and negotiate systems, as measured by interview, staff observations, case notes, and an evaluation tool.

**OBJECTIVE 3:** Provide education to staff of all Community and youth Agencies on current laws regarding homeless youth.

As a result, 85% of the staff will report increased understanding of the rights and responsibilities of families and youth with respect to runaway/homeless youth, as measured by pre- and post surveys, referrals and/or case conferences.

**OBJECTIVE 4:** Provide education to a total of eight school districts/community organizations on current laws and issues regarding homeless youth.

As a result, 75% of the school and/or community organizations will report increased understanding of homeless youth issues and of their rights and responsibilities as well as the rights and responsibilities of families and youth with respect to runaway/homeless youth, as measured by pre- and post surveys, referrals, and/or case conferences.

**OBJECTIVE 5:** Provide a preventive educational program on Independent Living Skills to at risk youth in the Town of Huntington eight school districts/community and youth agencies.

As a result, 50% of the youth will demonstrate increased awareness and skill of Independent Living as measured by pre- and post surveys, staff observation and/or program narratives.

**OBJECTIVE 6:** 10 homeless or potentially homeless youth will be referred to Sanctuary by local school districts and community organizations, as measured by referral statistics.

### B. EVALUATION METHODS:

The program will have several levels of evaluation:

- The Town of Huntington Youth Bureau and the Suffolk County Youth Bureau will be responsible for program evaluation.
- The Sanctuary Project Director will provide regular program and clinical supervision of the Independent Living Skills Program. Joint evaluation by the Project Director and the

3

Independent Living Skills Counselor will determine if treatment goals have been achieved.

- Statistics, reports, program observations and monitoring tools will be used to evaluate both process and outcome objectives, as well as overall program functioning. This data will be collected by the Youth Bureau Administration and by the Project Director.
- Individualized service plans will be reviewed by the Independent Living Skills Counselor weekly.
- Treatment plans will be re-evaluated monthly.
- A Monitoring Tool assessing the worker's observations of the client will be completed at intake and at closing (included in Appendices).
- An Evaluation Tool assessing the client's level of self-sufficiency will be done by the client and worker at intake and at closing (included in Appendices).
- A questionnaire will be distributed to all accessible clients 6 months, and then 1 year after completion of services to evaluate client's maintenance of skills and client satisfaction with Sanctuary services (included in Appendices).
- Quarterly progress reports and an annual report will be prepared to document the achievements of the program by objectives.

Please refer to appendices for samples of monitoring and evaluation tools.

## III. SERVICE METHODS:

The Independent Living Skills component of the Sanctuary Project offers:

**A. OUTREACH:** The Sanctuary Independent Living Counselor will outreach to the homeless youth population in order that they be aware of, and encouraged to participate in the Project's services. Sanctuary services will be publicized through brochures, posters, community/school presentations, key chains, pencils, and the Youth Yellow Pages. Outreach meetings will be held with other community agencies likely to encounter this population, so that workers will better understand project services and make appropriate referrals and linkages.

Street outreach is an important service method to reach many of these youth. Through the use of mobile youth counseling techniques, these youth become engaged and begin to develop trust to establish the working relationship. In order to engage this population through the use of street outreach, the Sanctuary Independent Living Counselor will educate workers from the local Community and Youth Agencies on issues related to homeless and potentially homeless youth. As a result, these workers will provide particularly important outreach linkages to homeless youth and will be able to make the appropriate referral to the Sanctuary Independent Living Counselor. When scheduling permits, the Independent Living Skills Counselor will join these workers in outreaching the homeless youth population.

In addition, 24 hours a day, seven days a week access to Sanctuary services is provided through the Project's Hotline number.

4

**B. CASE MANAGEMENT:** The Sanctuary Independent Living Counselor will make a comprehensive assessment of each homeless youth who makes contact with our services. The assessment will include current level of functioning, strengths and weaknesses, and areas needing growth. Based on this assessment, an individual service plan will be developed by the youth and the worker. The plan will address the following areas: basic physical needs including food, clothing and shelter; emotional and psychological needs; family, social and recreational needs; education, training and employment need; basic life skills needs; and legal and advocacy needs. The STILS Independent Living Counselor will provide referral, linkages and advocacy between the youth and outside delivery systems, and will provide in-house services as called for in the service plan. The Independent Living Counselor is responsible for the overall coordination, monitoring, and evaluation of service delivery for the homeless youth.

**C. COUNSELING:** Crisis intervention counseling will be offered to all homeless/potentially homeless youth who call Sanctuary. The worker will provide on-going counseling to the 30 homeless youth who have accepted case management services. The counseling will be directed towards providing emotional support to the youth while encouraging decision-making and problem-solving skill development. Emphasis will be on youth development to assist and empower the youth to assume personal responsibility and autonomy leading to the attainment of fully independent living. The youth will also be helped to develop support systems within the community, including natural supports of extended family, neighbors, friends, ethnic groups, and religious groups. Referral to Sanctuary's Family Counselor will be made when family mediation is indicated. An additional 10 youth will be offered short term counseling and concrete services.

**D. SCHOOL/STAFF COMMUNITY EDUCATION AND TRAINING:** The Independent Living Counselor will provide ongoing education and training on current laws and issues regarding homeless youth to school professionals, Huntington Youth Bureau staff, the Sanctuary Advisory Board, and community organizations.

## IV. ORGANIZATIONAL DESCRIPTION AND QUALIFICATIONS:

### A. ORGANIZATION'S EXPERIENCE AND RESOURCES:

The Town of Huntington Youth Bureau has been operating or contracting for youth services in Huntington since 1968. The Town of Huntington will subcontract the Sanctuary Transitional Independent Living Skills program to the Huntington Youth Bureau Youth Development research Institute, Inc., a community based not-for-profit corporation. The institute's goals are to promote youth development and provide services to youth and families. Sanctuary has been a part of the Institute since 1977, providing services to runaway and homeless youth. The Town of Huntington Youth Bureau developed the first runaway program on Long Island and later lent technical assistance to other programs in Nassau and Suffolk County.

The Institute operates a number of special projects: Huntington Drug and Alcohol Services - a

5

OCFS 2003                                              SANCTUARY - STILS

comprehensive drug and alcohol counseling, education, and prevention project which operates a substance abuse education, counseling and treatment program; Excel project for expressive arts, (Backstage Production and Writers Workshop) which provide youth with opportunities for self-discovery and self-expression, high school equivalency, job training and placement needs; FACILE for parenting needs when appropriate; Advantage Project for after school homework help and recreation for middle school youth; Youth Court Project for justice that is swift, compassionate and effective applied by a tribunal of trained teens; local community based youth serving agencies for recreation and other support services; and Sanctuary - a program which offers prevention services, crisis intervention and counseling for runaway and homeless youth or youth at risk of being runaway/homeless and their families.

### SANCTUARY TRANSITIONAL INDEPENDENT LIVING SKILLS PROGRAM (STILS) has been in full operation in the Town of Huntington since 1986. Through the efforts of this program in the last 15 years, 676 youth have received the intensive case management efforts that they require to stabilize their lives.

The Independent Living Counselor will work to establish and maintain linkages and develop working agreements with other agencies that provide valuable services for the homeless youth population. Examples of important linkages which are maintained include the following:

1. DSS for financial, housing, and other basic physical needs assistance;
2. DOL for education, training and employment needs;
3. DHS for health care and health maintenance needs;
4. EOC for higher education assessment and counseling needs;
5. Suffolk Community College/SUNY at Farmingdale for educational and basic skills needs;
6. BOCES for vocational and special education needs;
7. Huntington Youth Bureau:
   a. Excel Project for basic competency, high school equivalency, expressive arts ,job training and placement needs;
   b. Drug and Alcohol Project for drug abuse/alcohol abuse, information and referral, and counseling needs;
   c. FACILE for parenting skills where appropriate;
   d. Advantage Project – for after school homework help and recreation for middle school youth;
   e. HOPE for peer HIV/AIDS prevention program;
   f. Youth Court Project for justice that is swift, compassionate and effective applied by a tribunal of trained teens;
   g. Local community based youth serving agencies for recreational and other support services;
8. CARE and SHARE, Haven House and local Parish outreach centers for housing needs;
9. Madonna Heights, Mercy Center, Ryan House and Hope House for long-term placement;
10. Huntington Hospital for emergency and long-term health care and psychiatric needs;
11. Dolan Health Center for low cost health care needs;
12. Planned Parenthood for family planning and health care needs;

6

OCFS 2003                                                              SANCTUARY - STILS

13. Nassau-Suffolk Law Services and Statewide Youth Advocacy for legal counseling needs;
14. Pederson-Krag for psychiatric needs;
15. Long Island Institute For Group Work with Children and Adolescents for training on issues related to group work;
16. Touro Law School Housing Rights Project for legal counseling needs around housing issues;
17. Suffolk Network for Adolescent Pregnancy (SNAP) for family planning and resources;
18. Family Service League - for mental health services and family life education services, sliding scale;
19. Victims Information Bureau - for counseling victims of family violence;
20. Huntington DSS Advisory Board - for information and referral;
21. CORPS - Suffolk County Coalition of services for runaway youth, both residential and non-residential programs;
22. Empire State Coalition of Youth and Family Services - to continue to advocate for the needs of runaway and homeless youth on a state and federal level and to provide training opportunities for staff;
23. National Network For Youth - to maintain membership and participation in Symposium;

Please refer to the Appendices for the Sanctuary Organizational Chart.

## B. PERSONNEL:

### 1. Paid Staff:

**Qualifications:** BA or BS Degree in Social Work, Psychology or related field. One year experience working with youth, advocacy experience in concrete services;

**Duties:** Provide crisis intervention to 16 to 21 year old homeless youth, case assessment, planning and case management services. Provide referral and advocacy services to youth, assist in developing long term and short term housing, provide ongoing supportive and follow-up services to clients. Plan and provide group counseling services as needed. Develop special groups and programs for adolescents and families as needed. Help in recruitment of volunteer families. Aid in providing concrete services to youth. Plan and provide group workshops as needed.

**2. Volunteers:** The Sanctuary Advisory Board, a volunteer committee, acts as a citizen body and actively participates in fundraising campaigns, programs, outreach, and in workshops. Volunteer Interim Families are recruited, trained and supervised by the Sanctuary Project Director and appropriate staff.

Please refer to Appendices for the Independent Living Skills Worker Job Description.

## C. BOARD OF DIRECTORS:

The Town of Huntington Youth Bureau applies for and accepts money for this project. The implementation of the project is subcontracted to the Huntington Youth Bureau Youth Development

7

OCFS 2003                                                    SANCTUARY - STILS
Research Institute, Inc.

The Board of Directors of the Huntington Youth Bureau Youth Development Research Institute. Inc. enters into an agreement with the Town of Huntington Youth Bureau and contractually assigns the daily programmatic supervision of its projects to the appropriate staff members of the Town of Huntington Youth Bureau. The finances, however, are handled by the Board of Directors.

## 2002 BOARD OF DIRECTORS

President:        Frank P. Petrone
                  8 Vauxhall Ct.
                  Melville, NY 11747

Vice-President:   Mark Cuthbertson
                  c/o 100 Main Street
                  Huntington, NY 11743

Secretary:        Maria Georgiou
                  c/o 423 Park Avenue
                  Huntington, N.Y. 11743

Treasurer:        John Zanfino
                  c/o 100 Main Street
                  Northport, NY 11768

Trustee:          Kirk C. Mackey
                  4 Danny Court
                  Dix Hills, NY 11746

Trustee:          Christine Biernacki
                  9 Saylor Place
                  Halesite, NY 11743

Trustee:          John Leo
                  c/o 100 Main Street
                  Huntington, N.Y. 11743

Trustee:          Ron Daniels
                  61 Brand Drive
                  Huntington, N.Y. 11743

8

213

# EXHIBIT 13



PLAINTIFF'S
EXHIBIT

Hirschborn Co
8/2/00   H

1219

# SCHEDULE

| TIME | | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | TIME | |
|---|---|---|---|---|---|---|---|---|---|
| P E R I O D | S<br>·R·<br>I | | | | | | | Subject<br>Room<br>Instructor | |
| | S<br>·R·<br>I | | | | | | | S<br>·R·<br>I | **2** |
| | S<br>·R·<br>I | | | | | | | S<br>·R·<br>I | **3** |
| | S<br>·R·<br>I | | | | | | | S<br>·R·<br>I | **4** |
| | S<br>·R·<br>I | | | | | | | S<br>·R·<br>I | **5** |
| | S<br>·R·<br>I | | | | | | | S<br>·R·<br>I | **6** |
| | S<br>·R·<br>I | | | | | | | S<br>·R·<br>I | **7** |
| | S<br>·R·<br>I | | | | | | | S<br>·R·<br>I | **8** |

## COMPOSITION BOOK   •   9⅜ IN. x 7½ IN. (24.8 cm x 19 cm)

| AVAILABLE AS | SHEETS | RULING |
|---|---|---|
| **No. 09-4158** (101-Q) | 54 | Quadrille 5 Sqs. to Inch |
| **No. 09-4160** (101) | 60 | Wide Ruled & Margin |
| **No. 09-4166** (101-P) | 60 | Plain |
| **No. 09-6120** (104) | 120 | Wide Ruled & Margin |

VERNON McMILLAN Inc.
VM
THE ROYAL LINE
Made in U. S. A.

**VERNON McMILLAN, Inc.,**  ELIZABETH, N.J. 07208

## 1991 Cases

| Client # | Name | Age | Date Opened | Date Closed |
|---|---|---|---|---|
| | **October** | | | |
| 6240 | Ray ▬▬▬ | 17 | 10/9/91 | Logged as STKS case |
| 7227 | Christine ▬▬ | 16 | 10/17/91 | Continuing 1992 |
| 7227 | Barbara ▬▬ (mother) | | 10/17/91 | " |
| 2328 | Mark ▬▬ | 18 | 10/24/91 | 12/31/91 |
| | Barbara ▬▬ (mother) | | 10/24/91 | 12/31/91 |
| 1358 | Stacy ▬▬ | 16 | 10/30/91 | Continuing 1992 |
| | Bill & Pat (parents) | | Same | Continuing 1992 |
| 2329 | Jodi ▬▬ | 15 | 11/6/91 | Continuing 1992 |
| | Mr. ▬ (father) | | Same | " |
| 8364 | Bobby ▬▬ | 14 | 11/7/91 | Continuing 1992 |
| | Mr. H▬ (father) | | Same | " |

NOTE: Had been prior case of Alisa ▬▬, filed under same number

| Client # | Name | Age | Date Opened | Date Closed |
|---|---|---|---|---|
| 7230 | Eric ▬▬ | 10 | 12/19/91 | Continuing 1992 |
| | Grace ▬▬ (mother) | | | " |
| 2331 | Teresa ▬▬ | 19 | 11-13-91 | Continuing 1992 |

1221

Family Cases      Cont'd

2003

January

| | Case # | Name | Age | Date Opened / Closed |
|---|---|---|---|---|
| | 3403 | Ashley ▮▮▮▮ | 17 | 12/20/02 / 4/2/03 |
| | | **February** | **Age** | |
| group | 8432 | Kimberly ▮▮▮ | 14 | 2/4/03   6/12/03 |
| group | 8433 | Kristina ▮▮▮ | 11 | 2/4/03 / 5/19/03 |
| group | 8434 | Victoria ▮▮▮ | 12 | 2/4/03   5/19/03 |
| group | 8435 | Robert ▮▮▮ | 11 | 2/4/03   5/19/03 |
| group | 8436 | James ▮▮▮ | 11 | 2/19/03   6/12/03 |
| group | 8437 | Jaclyn ▮▮▮ | 11 | 2/19/03   5/19/03 |
| group | 8438 | Melissa ▮▮▮ | 11 | 2/19/03   6/12/03 |
| | 3404 | Danielle ▮▮▮ | 13 | 2/24/03   3/20/03 |
| group | 8440 | Kimberly ▮▮▮ | 11 | 2/24/03   6/12/03 |
| group | 8441 | Jennie ▮▮▮ | 12 | 2/24/03   5/19/03 |
| group | 8442 | Cassandra ▮▮▮ | 11 | 2/24/03   5/19/03 |
| | 7353 | Kim ▮▮▮ | 17 | 2/24/03   3/10/03 |
| | 3407 | Laurie ▮▮▮ | | 2/5/03 |
| | | **March** | | |
| | 1587 | Lauren ▮▮▮ | 16 | 3/14/03 / 6/10/03 |
| | 1588 | Joseph ▮▮▮ | 16 | 3/19/03 / 5/20/03 |

262

March          2003

| Case # | Name | Age | Date Opened / Closed | |
|--------|------|-----|---------------------|---|
| 2719 | Tiffany ▓▓ | 12 | 3/27/03 | 6/16/03 |

April    2003

May

| 7359 | Ricardo ▓▓ | 16 | 5/15/03 | 5/13/04 |
|------|-----------|-----|---------|---------|
| 7360 | Ryan ▓▓ | 16 | 5/15/03 | 7/17/03 |
| 7361 | Nadia ▓▓ | 13 | 5/15/03 | 5/13/04 |
| 3409 | Rhiannon ▓▓ | 15 | 5/28/03 | 7/17/03 |
| 3408 | Steven ▓▓ | 17 | 5/29/03 | 10/31/03 |

June   2003

| 8454 | Christina Maria ▓▓ | 18 | 6/5/03 | 8/7/03 |
|------|-------------------|-----|--------|--------|
| 8455 | Shalonda ▓▓ | 13 | 6/9/03 | 8/7/03 |
| 3411 | Shaliek ▓▓ | 15 | 4/25/03 | 6/7/04 |

| | July 2003 | Age | Date Opened / Closed | |
|--|-----------|-----|---------------------|---|
| 2727 | Dominique ▓▓ | 16 | 7/23/03 | 10/17/03 |
| 2728 | Amanda ▓▓ | 14 | 7/18/03 | 9/16/03 |

August

| 7363 | Makana ▓▓ | 8 | 8/4/03 | |
|------|-----------|---|--------|--|

1263

## September

| Case # | Name | Age | Date Opened/closed | |
|--------|------|-----|------|---|
| 1592 | Ashley ▮▮▮▮▮ | 13½ | 9/15/03 | 10/31/03 |

### October 2003

| | Case # | Name | Age | Date Opened | Closed | |
|---|--------|------|-----|------|---|---|
| | 2729 | Katrina ▮▮▮▮ | 17 | 10/6/03 | transf to RASW 6/7/04 | |
| | 2730 | Kari Anne ▮▮▮▮ | 16 | 10/6/03 | transf to RASW 6/7/04 | |
| group | 8479 | Kimberly ▮▮▮▮ | 12 | 10/22/03 | 1/30/04 | |
| group | 8480 | Tyler ▮▮▮▮ | 11 | 10/22/03 | 1/30/04 | |
| group | 8481 | Pierre ▮▮▮▮ | 10 | 10/22/03 | 1/30/04 | |
| group | 8482 | Adam ▮▮▮▮ | 11 | 10/22/03 | 1/30/04 | |
| group | 8483 | James R ▮▮▮▮ | 12 | 10/22/03 | 1/30/04 | |

### November 2003

| Case # | Name | Age | Date Opened | Closed | |
|--------|------|-----|------|---|---|
| 4066 | Jesse ▮▮▮▮ | 19 | 11/6/03 ? | 1/2/04 | |
| 7365 | Wagner ▮▮▮▮ | 17 | 11/17/03 | 5/11/04 | Not |
| 8484 | Karaann ▮▮▮▮ | 17 | 11/17/03 | 1/2/04 | |
| 4067 | Anthony ▮▮▮▮ | 17 | 11/18/03 | 12/22/03 | |

### December 2003

| Case # | Name | Age | Date Opened | Closed |
|--------|------|-----|------|---|
| 2735 | Matthew ▮▮▮▮ | 13 | 12/30/03 | 6/7/04 |

### January 2004

| Case # | Name | Age | Date Opened | Closed |
|--------|------|-----|------|---|
| 2735 | Matthew ▮▮▮▮ | 13 | 12/30/03 | 6/7/04 |
| 2738 | Jonathan ▮▮▮ | 16 | 11/14/04 | 3/10/04 |

126

# EXHIBIT 14

STATS DESCRIPTION

## UNDUPLICATED COUNT BY ACTIVITY CATEGORY

Definition of Unduplicated Count: Count the <u>number</u> <u>of</u> <u>individuals</u> receiving services.

*Formal Counseling:* the unduplicated number of youth/adults counseled (includes informal counseling and telephone counseling).

*Family Counseling:* the unduplicated number of youth/adults receiving family counseling.

*Group Counseling:* the unduplicated number of youth/adults receiving group counseling (requires a narrative).

*Terminated Group Counseling:* self-explanatory.

*Brief Service:* the unduplicated number of youth/adults receiving brief services.  Brief services are defined as telephone contacts or crisis intervention (single session).

*Terminated Brief Service:* self-explanatory

*Case Management:* the unduplicated number of youth/adults receiving formal counseling that are eligible for that program's annual contract goal.

*Terminated Case Management:* self-explanatory

*Voluntary Family Placements:* the unduplicated number of youth (through age 18) placed in our host homes.

*Emergency Placements:* the unduplicated number of youth receiving emergency placements through our agency (DSS, Seabury Barn, Gatehouse, etc.).

*Housing Needs:* the unduplicated number of youth/adults receiving information, referrals, assistance, and advocacy regarding housing needs.

*Training:* the unduplicated number of trainings given by our staff.  This includes client trainings (parent training, information sharing), agency trainings, and system trainings.  Narratives are required for any type of training given by Sanctuary staff.

*Prevention Education:* the unduplicated number of outsystem trainings given by Sanctuary staff (includes school trainings, outside agency trainings). Narratives required.

## Put Telephone Logs in Brief Service.

Df Ex A

STATS DESCRIPTION
(page 2)

DUPLICATED COUNT BY ACTIVITY CATEGORY

Definition of Duplicated Count: Count the <u>number</u> <u>of</u> <u>sessions</u> for all individuals.

COUNSELING:

*Formal Counseling:* the duplicated number of counseling sessions, hours, and individuals (youth/adults).

*Family Counseling:* the duplicated number of family counseling sessions, hours, and individuals.

*Group Counseling:* the duplicated number of group counseling sessions, hours, and individuals (youth/adults).  Narratives are required for each group.

*Informal Counseling:* the duplicated number of informal counseling sessions, hours, and individuals (youth/adults).  Includes informal contacts.

EDUCATION:

*Independent Living Skills:* the duplicated number of independent living skills sessions, hours, and individuals (youth/adults). Can be duplicated as a counseling session.

*Parent Training Skills:* the duplicated number of parent training skills sessions, hours, and individuals.  Can be duplicated as a counseling session.

*Training of Professionals:* the duplicated number of trainings given by our staff as measured in sessions, hours, and individuals present.  Includes school trainings, agency trainings, out-system trainings.

CASE MANAGEMENT:

*Case Conference:* the duplicated number of case conferences as measured in sessions, hours, and individuals.  Individuals are defined as the number of people (including self) involved in the case conference.

*Home Visits:* the duplicated number of home visits as measured in sessions, hours, and individuals.

*Advocacy:* the duplicated number of advocacy sessions, hours, and individuals (youth/adults).  Advocacy can occur in telephone calls, informal contacts, and formal counseling sessions.

2

## DUPLICATED COUNT BY ACTIVITY CATEGORY
### (continued)

*Crisis Intervention:* the duplicated number of crisis intervention sessions, hours, and individuals (youth/adults).

*Telephone Counseling:* the duplicated number of telephone counseling sessions, hours, and individuals.  Can be duplicated in formal counseling sessions.

*Food and Clothing:* the duplicated number food/clothing provisions and referrals as measured in sessions, hours, and individuals.

*Transportation:* the duplicated number of transports of youth as measured in sessions, hours, and individuals.

PLACEMENTS:

*Family Placements:* the duplicated number of host home placements (through age 18) as measured in sessions, hours, and individuals.

*Emergency Placements:* the duplicated number of emergency placements (through age 21) by our agency as measured in sessions, hours, and individuals (DSS, Seabury Barn, Gatehouse, St. Joseph's).

*Housing Needs:* the duplicated number of individuals receiving information, referral, assistance, and advocacy regarding housing needs as measured in sessions, hours, and individuals.

3

STATS DESCRIPTION
(page 4)

REFERRALS

**REFERRAL TO INSIDE SYSTEM**
**(FROM SELF)**

*Source:* Always use self.

*Client Description:* Sex, Age, Race (use code at bottom of page).

*Reason for Referral:* nature of problem.

*Referred to:* List specific agency/person (i.e. D&A, Sue Spaulding).

**REFERRAL TO OUTSIDE AGENCIES**
**(FROM SELF)**

*Source:* Always use self.

*Client Description:* Sex, Age, Race (use code at bottom of page).

*Reason for Referral:* Accessing needed services.

*Referred to:* List specific agency (i.e. Planned Parenthood).

**REFERRALS FROM INSIDE SYSTEM**
**(TO SELF)**

*Source:* Name of agency/person referring client.

*Client Description:* Sex, Age, Race (use code at bottom of page).

*Reason for Referral:* Problem/Situation (runaway, throwaway, homeless, PINS).

*Referred To:* Counseling (specify individual/group).

**REFERRALS FROM OUTSIDE AGENCIES**
**(TO SELF)**

*Source:* Name of agency/person referring client.

*Client Description:* Sex, Age, Race (use code at bottom of page).

*Reason for Referral:* Problem/Situation (runaway, throwaway, homeless, PINS).

*Referred To:* Counseling (specify individual/group).

4