# EXHIBIT 15



**New York State
Office of
Children & Family
Services**

George E. Pataki
*Governor*

John A. Johnson
*Commissioner*

*Capital View Office Park*

52 Washington Street
Rensselaer, NY 12144-2796

May 23, 2003

Ms. Patsy Hirschhorn
Youth Project Director
Town of Huntington Youth Bureau
423 Park Avenue
Huntington, NY 11743-2896

Dear Ms. Hirschhorn:

Attached is the New York State Office of Children and Family Services, Bureau of Compliance, inspection report on the Sanctuary Interim Family Program. As a result of the review, three compliance issues have been identified.

The Office of Children and Family Services requires a response by June 20, 2003. The response must include corrective actions and/or documentation for each compliance issue that will bring the program into compliance with regulations. Please submit the response to me at the address below and send a copy of the response to your Youth Development Specialist, Joe Marano.

OCFS Youth Development
Corporate Courthouse Center
320 Carleton Avenue, Suite 1200
Central Islip, NY 11722

Observations and recommendations noted in the report do not require a response to the Bureau of Compliance, however, your YDS may require a response to those observations and recommendations affecting program operations.

Please note that on-going technical assistance is the responsibility of your YDS, however, if you have any questions regarding this report feel free to contact me at (631) 342-7024.

Sincerely,

*Valerie a Field*

Valerie A. Fields
Bureau of Compliance

cc:   L. Pasti
      J. Marano, YDS
      P. Policastro, RHY Coordinator
      J. F. Kreutz, Director, Suffolk County Youth Bureau
      M. Georgio, Executive Director, Huntington Youth Bureau
      File



An Equal Opportunity Employer

4645

NYS Office of Children and Family Services
Office of Youth Development
Bureau of Compliance

Inspection Report

# Huntington Youth Bureau Sanctuary

## Program Overview:

The Sanctuary Interim Family Program is a Host Home program administered by the Huntington Youth Bureau providing emergency shelter to Runaway and Homeless youth up to age 18. The program provides crises intervention counseling, educational and vocational support services, family and individual counseling, case management, and other necessary services. The program was partially funded in 2002 through Suffolk County's RHYA eligibility in the amount of $16,389. Staff include a Program Director, which at the time of the review was in the process of being hired, a Family Social Worker and, a Secretary. The program is administratively supervised by Ms. Patsy Hirschhorn, the Youth Project Director.

## Inspection Process:

The inspection was conducted on January 24, 2003 at the 423 Park Avenue, Huntington NY administrative office of the Huntington Youth Bureau. The inspection included reviewing personnel records, Interim family files, youth case records, and program operation documentation.

## Participants in this review included:

Patsy Hirschhorn, Youth Project Director
Valerie Fields, OCFS

## Required Response:

For each compliance issue identified a response is required. The response must include a corrective action that will bring the program into compliance with requirements. In some cases documentation needs to be submitted to satisfy the compliance issue.

4646

**Compliance Issues:**

**Issue #1**  As a result of several staff changes, and the appointment of the new Program Director, the agency was unsure of the programs current organizational structure, program staffing and job duties and how program emergency and relief coverage would be provided. The agency must submit written clarification of the program's organizational structure, program staffing plan and job duties including emergency and relief coverage.

**Issue #2**  A review of the agency's personnel file indicated the following documentation was not available for review;

1. Documentation of Child Abuse Register Clearance for L. A Graeve, D. Orr, M. Chico,
2. Evidence of a physical exam for L. A. Graeve, D. Orr, M. Chico,
3. Personal references and reference verifications for D. Orr and M. Chico,
4. Sworn statements regarding the conviction of a crime, and regarding all information provided on the employment application is true, L. A Graeve, D. Orr and M. Chico,
5. Training documentation for L. A Graeve, D. Orr, J. Grosser, J. Schmidt, K, Haber and M. Chico.

The agency must submit documentation that verifies all employee files contain all required personnel documentation. Additionally, RHYA Regulation Subpart 182-1.(f)(1) requires the agency to maintain training documentation containing topic, date, length, presenter, and number of training hours received within a 12 month period for each program employee.

**Issue #3**  A review of the agency's youth case records indicated the following compliance issues

1. Initial assessments were incomplete, they did not contain the current functional level of each youth, nor did they indicate the probability of whether a youth would cause danger to themselves or others
2. Individual Service Plans were found to be incomplete. They did not appear to be developed with the youth, and case notes had no relationship to the goals specified in the individualized service plan.
3. Documentation of assistance to the youth and or family while in the host home in obtaining services provided by the program was not being maintained in the youth case record.
4. Discharge reports were incomplete regarding dates and times of discharge, whom the youth were discharged to, reviews of the youths' stay in the program, and plans for future services/case management after leaving the program.

4647

5.  Documentation that youth received information on prevention of child abuse and information concerning AIDS/HIV and universal precautions were not maintained in each youth case record.

The agency must ensure that all youth case records contain the required information and documentation, and are maintained in a timely manner.

## Observations/Recommendations:

A subsequent meeting with this program's new Director, Mr. Anthony Zenkus, was held shortly after this inspection. It was recommended that the agency review the overall operation of the program, its current organizational structure, as it relates to the Sanctuary program including the job duties of all staff to ensure the program is operating consistent with RHYA Regulations. The new Program Director appeared knowledgeable of how the program should be operating, and eager to begin adjustments.

# EXHIBIT 16

# PROGRAM ANNUAL REPORT
### (See instructions on reverse)

State of New York
OFFICE OF CHILDREN AND FAMILY SERVICES
Form OCFS3140(Front)(Rev 9/98)

Sponsoring Municipality: T HUNTINGTON            Program Code: 03471740T002   Fund: RHYAII

**Implementing Agency:** HUNT YTH BUR YTH DEV RSCH INST
**Program Title:** SANCTUARY-STILS PROGRAM
**Agency Address:** 423 PARK AVENUE, HUNGTINGTON, NY  11743

**Contact Person:** ANTHONY   ZENKUS             Title: PROJECT DIR.
**Telephone Number:** (516) 271-2183

## PROGRAM SITES

| Type | Address | Assembly District | Senate District | Local Plng Board | City Council District |
|------|---------|-------------------|-----------------|------------------|----------------------|
| OFFICE | 423 PARK AVE HUNTINGTON  11743 | 9 | 2 | | |

## PROGRAM PROFILE

| | Problem/Need | Target | Service Methods | | Number of Youth to be served | Unduplicated Count |
|---|---|---|---|---|---|---|
| Primary | 713 | 719 | 560 | 524 | 30 | 45 |
| Secondary | 716 | 719 | 566 | 530 | 30 | |

**STATISTICAL REPORT:** Use only Whole Numbers. Do **NOT** use Percentages.
_____ No direct services provided to youth.

Unduplicated Number of Youth Served: __28__
Gender: Male __5__  Female __23__
Ethnicity:   White __10__   Black __14__   Hispanic __4__   American Indian __0__
Asian __0__   Other __0__
Age: 0 - 4 __0__   5 - 9 __0__   10 - 15 __0__   16 - 20 __28__

Narrative attached as per instructions on Reverse: Yes __x__   No _____

**MONITORING** - Describe the methods used to monitor this program during the reporting period. Include who conducted the monitoring, when it was conducted, and how the results were used. (Attach additional page if necessary).

PLAINTIFF'S EXHIBIT
ZENKUS 10
7/12/06

PREPARED BY: _(signature)_   TITLE _Project Director_   DATE _2/2/04_
Signature of Program director or designee

CERTIFIED BY: _(signature)_   TITLE _CEO Dir_   DATE _2/3/04_
Signature of Chief Executive Officer
(or designee), or Agency Executive Director if direct contact

1192

ANNUAL PROGRAM NARRATIVE REPORT

PROGRAM YEAR: 2003

AGENCY: HYBYDRI SANCTUJARY PROJECT - STILS

1. **MAJOR ACCOMPLISHMENTS OF THE PROGRAY YEAR, INCLUDING STATUS OF OBJECTIVES LISTED IN THE CONTRACT.**

Independent Living Skills counseling and intensive case management were provided to **28** youth in 2003. This included resolution of the homeless crisis through housing advocacy and assisting youth to focus their self-determination towards the development of problem solving skills, more effective coping skills and other life skills. Family mediation through the services of the Independent Living Skills counselor was also utilized to resolve homelessness in appropriate cases. An additional **147** youth received Independent Living Skills training through a series of workshops.

Outreach with other staff from the Huntington Youth Bureau System continued in 2003. This outreach helped identify youth in need of Sanctuary services. This comprehensive involvement with system agencies provides youth with additional assets and enhanced skills to cope with or improve their home environment. Regular outreach was performed at schools, in the Community Youth Agencies, and at times on the streets.

The Independent Living Skills Counselor continues to be available to the eight school districts of the Town of Huntington for crisis intervention with homeless or potentially homeless youth. This immediate intervention on school grounds provides the youth with support; information and resources to better evaluate their current situation. Many of these youth become involved with Sanctuary and with the other programs of the Huntington Youth Bureau System. Sanctuary maintains an aggressive outreach plan to identify youth in need of Independent Living Skills training.

**DESCRIBE ANY OBSTACLES OR PROBLEMS, WHICH OCCURRED DURING THE PROGRAM YEAR, HINDERING PROGRESS TOWARD PROGRAM OBJECTIVES. INCLUDE DISCUSSION OF STEPS TAKEN OR PLANNED TO OVERCOME THOSE OBSTACLES.**

The Independent Living Skills program did not meet its program objectives for the second year in a row, and a staffing change was made to address this problem. The program was unstaffed for 3 months, and the new Independent Living Skills Counselor inherited a caseload of zero. The program was able to serve 7 clients at the end of the program year and the numbers continue to grow.

There continues to be a shortage of housing for the 16 to 21 year old population within the community. At various times throughout the year, older male adolescents require emergency housing. Some of these youth refuse a referral to DSS Emergency Housing when they learn that the placement is outside the community. This takes the youth from

valuable support systems and places of employment lessening the opportunity to receive Independent Living Skills training. Some youth express concerns for their personal safety in DSS Housing in which adolescents are housed with adults. Other youth, both male and female, are denied housing through DSS Emergency Services and are left with few options.

### 1. DESCRIBE LINKAGES AND WORKING RELATIONSHIPS INITIATED OR CONTINUED, GIVING A SENSE OF THE VALUE OF THESE LINKAGES.

Sanctuary continues to maintain relationships with all existing linkages. The Sanctuary Project Director has served as a member of the Board of Directors of the Empire State Coalition of Youth and Families, and the program itself continues to be a member of the National Network for Youth. The Sanctuary Director maintains active membership in the Coalition of Runaway Programs (C.O.R.P.S.) in Suffolk County. The Independent Living Counselor regularly attends DSS Advisory Board meetings.

These linkages are extremely valuable as they provide the opportunity for the Independent Living Skills Counselor to share and receive information on homeless youth issues with other groups through the involvement of the entire Sanctuary staff with other groups and organizations. This involvement also helps to develop a more effective, stronger network for advocacy for this population.

The Independent Living Skills Counselor has maintained strong relations with various personnel in the eight school districts in the Town of Huntington, housing resources and other community-based agencies. As a result of these relationships, the Independent Living Skills Counselor has successfully advocated on behalf of youth to attain housing and employment.

### 2. NOTE AREAS OF TECHNICAL ASSISTANCE THAT WOULD BE BENEFICIAL TO THE OPERATION OF THE PROGRAM.

Staff training and travel currently comes from fund-raised or non-OCFS agency income. In order to maintain the level of professionalism and expertise needed to serve these homeless youth, ongoing education through trainings, workshops and seminars are a necessity. An increase in funding to cover this cost is needed.

### MONITORING METHODS

The Sanctuary Project Director provides regular, weekly supervision to the Independent Living Skills Counselor. The Project Director monitors case progress, interventions and termination. In addition, the Independent Living Skills Counselor participates in Case Review with all staff on a weekly basis and peer supervision once a week.

Data is collected by the Huntington Youth Bureau and by the Project Director. This data is collected by reports, program observations and monitoring methods.

1194

The Independent Living Skills Counselor administers a monitoring tool assessing the youth's progress on Independent Living Skills Development once a month to clients. The Independent Living Skills Counselor updates treatment/goal plans at designated time frames.

RHYMIS information is completed for all youth.  This information (with all identifying information erased) is sent semi-annually to FYSB in order to develop a national database on runaway/homeless youth issues.

# EXHIBIT 17

# Janie E. Schmidt

Four Oxbow Court
East Northport, NY 11731
631.368.7611

September 17, 2003

Anthony:

This letter serves to respond to the Performance Appraisal you gave me, which was signed on September 17, 2003, and covers the period of December 2002 through September 2003. As an overall response, I believe that the Performance Appraisal is unfair, and does not objectively reflect my true performance during the appraisal period.

One major point that I take issue with is your statement that I have met with less than one half of a minimum of 40 youths annually, which is inaccurate based on Sanctuary's standards as you have explained them to me. You have told me on numerous occasions that each of the youths an Independent Living Skills Counselor meets with, both on an individual basis and in a group, counts towards the 40 youth minimum. Based on that standard, as of September 17, 2003 I have met with a total of 49 youths, yet you rate me as "Unsatisfactory" in terms of my "General work quantity". In addition, based on my years of experience as an Independent Living Skills Counselor, the summer months tend to be the slowest in terms of youths requiring Sanctuary's services. However, as the school year begins, the number of youths requiring Sanctuary's services in general, and my services specifically, rises and I therefore expect my final numbers to be even higher by the end of the calendar year. Based on this misconception of the numbers, I therefore believe that many of the negative comments in the Performance Appraisal are inaccurate.

I would like to respond more specifically to some of the individual areas of work appraised on page one of the Performance Appraisal, and do so as follows:

General work quality; Ability to work with public:

For "General work quality," it is unclear on what you base this "Poor" rating, and from what I can discern it does not seem to be based on objective criteria. Based on the feedback I have received from the youths I work with, as well as co-workers, other supervisors, professionals in the schools and others in the community, I believe the quality of my work is good to excellent. I would encourage you to speak with the teachers, social workers, guidance personnel and school psychologists with whom I have worked, as they have observed me giving workshops and working with youths, and could give you objective feedback about the quality of my work.

For "Ability to work with public," I must say that I was shocked to receive a rating of "Fair." In my more than thirteen years of working in the Huntington Youth Bureau, I have received formal and informal appraisals of "Excellent" from HYB staff and other professionals with regard to my work with the public. I have established and maintained good relationships with many individuals in the school districts Sanctuary serves.

Acceptance of Responsibility; Cooperation; Task Completion; Reliability:

My response to these appraisals is similar to that regarding the general quality of my work. It is unclear to me on what you base these rankings, and it does not appear that they are based on any identifiable, objective criteria. In each of these areas, you rate my performance as "Poor." While I can think of examples when I have been asked to perform certain duties that I, as well as others, have judged to be unsafe, I have always offered alternative ways of

**EE0189**

reaching out to those clients. I do not consider making alternative suggestions as uncooperative or as not accepting responsibility. Based on that, I do not believe that such low rankings in these areas are justified.

As I previously mentioned, I have been a part of the Huntington Youth Bureau for over thirteen years, and during that time I have worked with many different people, both within HYB and outside in the community that we serve. I have enjoyed collaborative relationships with the people with whom I have worked throughout that time, mainly because everybody has understood that through such collaboration, we can most successfully reach our common goal of assisting the youths in the town of Huntington.

When you joined Sanctuary as Director, I was looking forward to having a supportive relationship with you. However, instead of feeling like I had a new Director who was striving for a common goal, I was met with a level of combativeness, constantly reminded that we were not colleagues or co-workers, but that you were my director and I your subordinate. While I have always given due respect to my supervisors and recognized the fact that the ultimate responsibility for Sanctuary lies with him or her, I was always encouraged to give my input, make suggestions, and act as part of a team. You have responded to my actions as if you believe I have tried to undermine you or not give you the respect you believed you deserved. You have continually misinterpreted comments I make towards you as being insubordinate, where I intend them to be a constructive dialogue. Thus, our interactions have been difficult. You are correct, however, that I do view some of our meetings as threatening and punitive, for reasons I have brought to your attention in the past.

In the past I had always looked forward to my supervision sessions. The rankings I received in those areas connote a belief that I have an inherent problem with supervision. That has never been, nor is it now, the case.

In light of what I have explained, I believe a reconsideration of your assessment of my performance is warranted.

Yours truly,


Janie Schmidt


EE0190

# EXHIBIT 18

## INTEROFFICE MEMORANDUM

**TO:** MARIA

**FROM:** PATSY _PH_

**SUBJECT:** SANCTUARY STILS PROGRAM

**DATE:** 9/26/03

As we discussed last week, a performance appraisal was presented to each of the three full-time Sanctuary counselors. The evaluation of Janie Schmidt reflects her failure to provide intensive case management to the required number of youth. This is despite specific directives and reminders provided to her consistently since January, 2003.

Today, Anthony and I met with Janie and informed her that her failure to provide the above-noted services places the STILS program in jeopardy. To date, she has opened case files for 21 individual clients. Just prior to the 9/17 performance appraisal I performed a spot check of 9 of these case files. I informed Janie that of these 9 files, 4 had been seen just 1 time, and Janie asked if I had the names of these 4 youth. I proceeded to name them, and she stated facts about the cases to explain why they had been seen just once. I stated that her notes were clear about the reasons these youth were not seen more than once; nonetheless, these youth could not be considered to have received intensive case management. Assuming that these were the only 4 youth of the 21 opened cases who were seen only once, only 17 youth are left to have received intensive case management as of this date.

Janie then proceeded to indicate that she was doing all that she possibly could to increase her caseload. She also began to state that she had excellent personal relationships in the community.

I indicated that the fact is that with only 3 months left in 2003, she is at least 23 youth short of the required 40 who must receive intensive case management. I added that on September 3 she had stated that more youth would be referred once the school year was underway and at that time I had suggested that 16-21 year old youth who are homeless or at high risk of being homeless might very well not be referred through schools. Subsequent to this I had reviewed the STILS records of cases opened since 1995. I reported that in 2002 Janie had opened only 3 cases during September through December, and that in no year since 1995 had 23 cases been opened during these 4 months.

Janie did not dispute or otherwise comment on her caseload except to say that she had both followed directions and been innovative. She stated that she had placed several calls to Peggy Boyd and had received a call back from Lisa Jamison on 9/24 stating that she should call back..

I repeated to Janie that we were obligated to provide 40 youth with intensive case management. Her failure to have met even half of that mandate with only one quarter of the year left gave the agency no choice but to ask her to resign from the STILS position or to face dismissal. She said she would not resign. I then asked Anthony if he would present her with the letter of termination, which had been prepared prior to the meeting (as had a letter of acceptance of her resignation.) The letter was presented, and was read by Janie. She was then told that she must return

Hirschhorn #66

her keys and all other items belonging to the agency. She was told that she could do this and leave immediately or return early Friday or Monday AM by appointment. Janie said she had something else to say but did not want to say it in front of Anthony. Janie then left the room and went to the 3rd floor.

After about 15 minutes had passed and Janie had not returned the building keys, I called her at her desk and asked her to bring them to my office. She said she had come down before but I was talking with the grant writer in my office so she had gone back to 3rd floor.

Janie soon came to my office with the keys. I asked if she wished to sit down and close the door. She said no, and handed me the keys. She then said she had never been so disappointed in anyone as she was in me – personally. I asked if she had anything else she wished to say, and she said no.

Janine had been informed of the meeting with Janie prior to its happening and was informed of its outcome. She went to Janie's work space and spoke with her re: returning on Friday at 8:30AM to complete gathering her personal belongings. Janie said she had plans which prohibited her from being here at 8:30, but she would come in later in the morning on Friday.

Friday morning Janie returned to her desk and gathered her belongings. She spent approximately 1 hour at her desk and then left the building.

Please let me know if there are any questions you have regarding the content of this memo.

EXHIBIT 19



# BOND, SCHOENECK & KING, PLLC
ATTORNEYS AT LAW ■ NEW YORK  FLORIDA  KANSAS

ERNEST R. STOLZER
Direct: 646-253-2326
estolzer@bsk.com

July 23, 2004

U.S. Equal Employment Opportunity Commission
33 Whitehall Street
New York, New York 10004

Re:   *Janie Schmidt v. Town of Huntington*
      *Charge No. 160-2004-02201*



JUL 2 6 2004

EEOC-NYDO-CRTIU

Dear Sir/Madam:

This response to the above-captioned charge of discrimination is submitted on behalf of the Huntington Youth Bureau (hereinafter referred to as the "HYB") and the Town of Huntington (hereinafter referred to as the "Town"). This response is based upon the interview of officials and employees of the HYB and review of relevant documents.

Initially, the HYB and Town deny that the Complainant, Janie Schmidt was discriminated against based upon her age or as retaliation as alleged in the charge of discrimination. Rather than attempt to respond point by point to the affidavit submitted by the Complainant, the following is a narrative account of the facts and circumstances leading to the termination of Ms. Schmidt.

The HYB has a number of different programs for the youth and families of the Town of Huntington. (A copy of a brochure describing the services provided is attached as Exhibit "1"). At issue in this proceeding is the Sanctuary Project which provides crisis intervention and counseling for homeless youths, referrals for short-term housing, and information and help in developing independent living skills for homeless youths between the ages 16 to 21. (A copy of a brochure describing the services provided by the Sanctuary Project is attached as Exhibit "2".).

Ms. Schmidt began her employment at HYB in January of 1990 as an Employment Counselor for Project Enterprise/Excel, a program that provides GED and SAT preparation; job counseling and development and arts programs for youth. In November of 1999, Ms. Schmidt applied for and was hired in Project Sanctuary as an Independent Living Skills Counselor. (A copy of the job description for that position is attached as Exhibit "3".) The basic job function of an Independent Living Skills Counselor is "[t]o provide crisis intervention, case management, and

Hirschhorn
Ex #4



U.S. Equal Employment Opportunity Commission
July 21, 2004
Page 2

counseling services to 16 to 21 year old homeless youth". Among the essential functions of the
job are:

- Maintain a full caseload of clients, as defined by the Project Director;

- Responsible for the outreach to homeless youth to inform and encourage
  participation in the Project's services;

- Possession of maturity and skills necessary to provide crisis intervention,
  ongoing individual counseling, advocacy and group work services to
  youth; and

- Worker must be able to meet and engage with youth in a variety of
  settings (e.g., school, parks, other agencies, home, etc.).

The highest ranking official of the HYB is Executive Director Maria Georgiou. She had been
the Executive Director of HYB for about 2 ½ years at the time Ms. Schmidt was terminated. Ms.
Georgiou is 57 years old.

Patsy Hirschhorn has been a Youth Project Director at HYB since June of 2000. Ms. Hirschhorn
assumed supervision of the Sanctuary Program in September of 2002. Ms. Hirschhorn is 58
years old.

The Sanctuary Project is funded by grants from New York State, the Federal government and the
Town of Huntington. In order to obtain and keep the funding, the Program must meet very
specific guidelines from the State and Federal governments. The state grant provides a large part
of the Sanctuary Project funding, The Project has to apply annually for the funding and has to
meet the objectives established by the State.

Anthony Zenkus was hired on December 9, 2002 as the new Director of the Sanctuary Project.
Ms. Georgiou and Ms. Hirschhorn determined there was a strong need for increased supervision
of the Sanctuary Project. In particular, Mr. Zenkus was charged with significantly increasing the
number of youth being provided intensive counseling services. There was a real concern that the
number of youth being served in the project during the prior few years had fallen low enough
that funding for the project could be discontinued.

In January of 2003, Ms. Hirschhorn worked with Mr. Zenkus in completing the New York State
Office of Children and Family Services Annual Report form that had to be submitted to the State
of New York. As the Independent Living Skills Counselor, Ms. Schmidt was required by the
Office of Children and Family Services ("OCFS") to provide counseling and intensive case
management to 45 youth ages 16 to 21 in 2002. However, Ms. Schmidt provided intensive case
management to only 27 homeless and potentially homeless youth ages 16 to 21. As such, the
project was forced to report that it had not met the requested objective. (See page 1 of Exhibit
"4").

U.S. Equal Employment Opportunity Commission
July 21, 2004
Page 3


Ms. Schmidt was informed of the failure to meet the target number and need to remedy the
problem. Ms. Schmidt did not deny she had failed to meet the OCFS requirement. Mr. Zenkus
gave a memorandum to Ms. Schmidt on or about January 29, 2003, detailing the requirements
for her position as the Independent Living Skills Counselor ( A copy of the memorandum is
attached as Exhibit "5"). The memorandum was the result of a discussion between Ms.
Hirschhorn and Mr. Zenkus regarding the goals and requirements for the position.

Ms. Schmidt questioned the other Sanctuary Project counselors if they had received such a
memo. Ms. Schmidt complained directly to Ms. Hirschhorn, and particularly complained that
the other counselors had not gotten a similar memorandum. In response, Ms. Hirschhorn told her
she was aware of the contents of the memorandum. She also told Ms. Schmidt that she agreed
each of the Sanctuary counselors should receive a memorandum regarding the targets, but she
was contacted first because she had been in her position for a full year as opposed to the couple
of months the other two (2) employees had been in their positions, and that she (Ms. Schmidt)
had missed her 2002 OFCS target by the greatest amount.

Mr. Zenkus met with Ms. Schmidt on January 30, 2003. During that meeting, he told Ms.
Schmidt that in the future she should discuss her issues about his directives with him and not
question the staff about the directives. Mr. Zenkus asked her where was her weekly schedule for
the prior week that should have been submitted the prior Friday. She responded the report was
still on her desk. Ms. Schmidt then got up to leave. Mr. Zenkus asked her where she was going
and told her to sit down because the meeting was not over. Ms. Schmidt refused saying she was
going to get the schedule. When Mr. Zenkus insisted she stay, Ms. Schmidt refused. She then
said her "heart was going like this" and left the room. Ms. Schmidt did not say she was ill, and,
in fact, worked the rest of the day including driving to Northport High School to do assigned
tasks.

Mr. Zenkus prepared a letter of warning dated February 4, 2003 to Ms. Schmidt about their
meeting on January 30, 2003. He discussed the letter with Ms. Hirschhorn. She felt that the
memorandum should be given to Ms. Schmidt. However, Mr. Zenkus asked Ms. Hirschhorn if
Ms. Schmidt started to perform the requirements of her position could the memorandum not be
given to her. Ms. Hirschhorn very reluctantly agreed to his suggestion.

Approximately two (2) weeks, later Mrs. Hirschhorn, Mr. Zenkus and Ms. Schmidt met. Ms.
Schmidt was told the memo had been prepared but it would not be filed in her personnel folder if
Ms. Schmidt agreed to cooperate with Mr. Zenkus, and made progress toward meeting with the
target number of youth. Ms. Schmidt agreed to cooperate with Mr. Zenkus and reach her targets.
The letter was not placed in her file at that time.

On March 13, 2003, Ms. Hirschhorn sent a memorandum to Mr. Zenkus regarding case
management targets for Ms. Schmidt. (A copy of the memorandum is attached as Exhibit "6").

U.S. Equal Employment Opportunity Commission
July 21, 2004
Page 4

Ms. Hirschhorn's memorandum to Mr. Zenkus emphasized the need for meeting the OFCS targets for intensive case management for youth ages 16 to 21. In particular, Ms. Hirschhorn stated:

> In particular, I refer your attention paragraph 2, page 6. To maintain the annual average # of youth who receive intensive case management, 62 youth must be thus served in 2003. Calculation: 676/15 years = 45/yr. Avg. add the 27 served in 2002, the 16 year total = 703. To have a 45/yr. Avg. at the end of 2003, 62 youth must be served this year (45/yr. X 17 yrs. = 765). Accordingly, 15-16 youth should have received intensive case management as of 3/31/03, as that = ¼ of the year & 15-16 = ¼ of 62.
>
> It is imperative that we have a clear plan to reach this goal. First of all, I need an exact account of the # of youth who have received intensive case management in 2003. This number will help us direct our plan.
>
> Due to the recent hiring of a street worker in Region 1, a logical connection would be between the STILS (Independent Living Counselor) worker and the street worker.

Attached to Ms. Hirschhorn's Memorandum was the OCFS proposal prepared by Mr. Zenkus' predecessor Jeannette Myers on July 26, 2002 which delineated the Independent Living Skills Program Funding guidelines. (A copy is attached as Exhibit "7"). The OCFS proposal emphasized the need for Street Outreach by the Independent Living Skills Counselor (See page 4 of Exhibit "7").

Mr. Zenkus met with Ms. Schmidt on March 14, 2003, and directed her to immediately include street outreach in her schedule. She was also directed to consult with Maria White, Region 1 street outreach worker about joint street outreach programs. Ms. Schmidt told Mr. Zenkus she had provided only six (6) clients with services to that date in 2003.

On March 17, 2003, Ms. Hirschhorn met with Mr. Zenkus and was made aware of his March 14 meeting with Ms. Schmidt. Ms. Hirschhorn sent a memorandum to Ms. Georgiou. (A copy of memorandum is attached as Exhibit "8").

Ms. Schmidt was directed by Mr. Zenkus to perform street outreach on April 15, 2003 in an attempt to attract homeless youth to the program. The day she was directed to do so was a sunny, mild day and it was suggested to Ms. Schmidt that she go to Huntington Village to perform the street outreach. Ms. Schmidt refused to perform the outreach. Mr. Zenkus issued Ms. Schmidt a Memorandum of Warning dated April 21, 2003 regarding her failure to perform

U.S. Equal Employment Opportunity Commission
July 21, 2004
Page 5

the directed street outreach. (A copy of the memorandum is attached as Exhibit "9"). Copies of
the memorandum were given at the time to Ms. Georgiou and Ms. Hirschhorn.

Ms. Georgiou met with Ms. Schmidt about the outreach issue. Ms. Georgiou had personally
been involved in planning so that Ms. Schmidt's outreach was done in a part of Town and during
hours that were comfortable. Ms. Schmidt's main catchment area was Main Street in Huntington
between 3:00 p.m. and 6:00 p.m. Ms. Georgiou told Ms. Schmidt she should meet with the
target youth at the library, Sam Goody's, the Book Review book store, Starbuck's and similar
places where youth of the targeted ages congregate. Ms. Georgiou explained all this to Ms.
Schmidt when they met and emphasized that outreach was part of her job. Ms. Georgiou told her
that refusing to do outreach was insubordinate. Ms. Georgiou also made it clear to Ms. Schmidt
that any statement to her by the then deceased Ms. Kalman that outreach was not part of her job
was not correct and did not reflect Agency Policy. Ms. Georgiou also made it clear to Ms.
Schmidt that she had to start working cooperatively with Mr. Zenkus.

At that time, Ms. Hirschhorn suggested to Ms. Georgiou that Ms. Schmidt be fired based upon
her refusal to do the street outreach and her general negative attitude toward performing the
duties of her position. Mr. Zenkus opposed the termination because he felt he could get Ms.
Schmidt to perform the necessary services. Ms. Georgiou decided not to fire Ms. Schmidt at that
time.

However, Ms. Georgiou did issue Ms. Schmidt a letter upholding Mr. Zenkus' Memorandum of
Warning. Ms. Georgiou issued Ms. Schmidt a Letter of Warning dated May 1, 2003. (A copy is
attached as Exhibit "10"). In that Memorandum, Ms. Georgiou specifically noted to Ms.
Schmidt:

> Street outreach is a function of your position and you will be
> required to do outreach whether paired with another worker or
> alone. Please note that there is no policy nor has there been one in
> the Youth Bureau system that states: "Outreach should never be
> done alone".

Ms. Schmidt responded to Ms. Georgiou in a letter dated May 8, 2003. (The letter is attached as
Exhibit "11").

The Onesti Motel was a prime location of homeless youth who are potential clients for the
Sanctuary Project's outreach program. During the first week of August 2003, Mr. Zenkus
informed Ms. Schmidt that she needed to visit the Onesti Motel to attempt to meet potential
clients and get them to utilize the program. Ms. Schmidt responded she did not want to go to the
motel to meet clients and other options should be considered. Mr. Zenkus told her that options
such as meeting them at a diner were good, but there had to be contact at the motel for such

U.S. Equal Employment Opportunity Commission
July 21, 2004
Page 6

meetings to occur. Ms. Schmidt insisted she did not see why she had to meet clients at the Onesti Motel. Mr. Zenkus reminded Ms. Schmidt that was the population she worked with as per her job description. Mr. Zenkus sent Ms. Schmidt a memorandum dated August 12, 2003, about meeting potential clients at the Onesti Motel. (A copy of the memorandum is attached as Exhibit "12"). The Memorandum made it clear that Ms. Schmidt did not have to go the Onesti Motel alone, but could go with Clara Murphy, who was another Agency employee. Ms. Murphy's duties included providing meals and transportation for motel residents. Ms. Schmidt was directed to block out a few hours on her schedule to visit the motel.

Ms. Schmidt's response was to meet with Mr. Zenkus and tell him his memorandum was "the most controlling thing she had ever received." Mr. Zenkus reiterated to her that she had to visit the motel. Mr. Zenkus then contacted Ms. Murphy to discuss how Ms. Schmidt could be involved with the motel's potential clients. At a staff meeting on August 19, 2003, Ms. Schmidt told Mr. Zenkus that he should not call workers from other Agency projects to make plans for Sanctuary Program staff.

In late August of 2003, the Agency was being audited by the State's Office of Children and Family Services. Ms. Hirschhorn directed Mr. Zenkus to have his staff supply a step by step outline of the procedures for placing runaway homeless youth in Host Homes. Ms. Hirschhorn specifically suggested he ask Ms. Schmidt for the information first, since she had been at the Sanctuary Project longer than the other employees. Mr. Zenkus asked Ms. Schmidt to draft an outline of the Project's policy for placing runaway homeless children in Host Homes. Ms. Schmidt's response was she did not think she should do it and one of the other employees should do the outline. Mr. Zenkus told Ms. Schmidt she was to prepare the outline. On August 26, 2003, Mr. Zenkus left Ms. Schmidt a note telling her he needed the outline by Thursday, August 28, 2003. Ms. Schmidt told Mr. Zenkus that Ms. Grosser had the policy and she would work on it the next day. On August 27, Mr. Zenkus asked Ms. Grosser who did most of the policy and she told him that she did. That afternoon, Mr. Zenkus asked Ms. Schmidt to type up the policy for him so he could deliver it to Ms. Hirschhorn. Ms. Schmidt refused, responding "I don't type."

In a separate meeting, Mr. Zenkus asked Ms. Schmidt what she meant by "I can't type." Ms. Schmidt said she did not know how to type. Mr. Zenkus told her that was part of her job, and she should acquire a typing tutorial program for the computer which she would be able to practice on work time.

In a meeting after that, Ms. Schmidt told Mr. Zenkus she did not need a typing tutorial because she could type, but did not know how to type on the computer. Mr. Zenkus reminded her that the use of the computer was a job requirement, and she had signed on her job application that she was proficient with computers. (A copy of her application is attached as Exhibit "13"); see Job Description for Ms. Schmidt's position attached as Exhibit "3"). Mr. Zenkus also told Ms. Schmidt there was a standard typewriter in the office she could use for the assignment. Mr.

U.S. Equal Employment Opportunity Commission
July 21, 2004
Page 7

Zenkus wrote her a memorandum dated September 3, 2003 about the typing issue to which Ms.
Schmidt responded by memorandum dated September 4, 2004. (Memorandum are attached as
Exhibit "14" and Exhibit "15", respectively).

Ms. Hirschhorn met with Ms. Schmidt and Ms. Grosser on September 3, 2003 to review the
target numbers for service of homeless youth required by the State's Office of Child and Family
Services ("OCFS") which was necessary to fill out the grant application for continuation of grant
monies to the Sanctuary Program in 2004. Ms. Schmidt and Ms. Grosser provided information
about their current caseload.

Mr. Schmidt provided Ms. Hirschhorn with a list of OCFS group members, which consisted of
ten (10) females in confined facilities with aggressive hostile behaviors. Of the ten (10) females,
seven (7) were between the ages of 16 and 21. Ms. Hirschhorn asked her if she was providing
any of the youth (ages 16 to 21) with intensive case management, and she said she was not. Ms.
Hirschhorn asked her to describe all of her open cases and Ms. Schmidt discussed three (3)
youth. After reviewing the particulars of the three (3) cases, Ms. Hirschhorn told Ms. Schmidt
that it appeared none of the three (3) were actively receiving required service and Ms. Schmidt
agreed. Ms. Hirschhorn told Ms. Schmidt she was concerned about her lack of success in
serving the number of youth targeted by OCFS. Ms. Schmidt's response was that with school
starting the numbers would rise. Ms. Hirschhorn told her she did not think that was correct since
referrals for her services did not primarily come from school staff. Ms. Hirschhorn suggested
she immediately visit Peggy Boyd at the FACILE program and Fran Leek at St. Hugh's to
identify herself and the services she could provide to youth in need of intensive case
management. Ms. Schmidt's response was to thank her for her honesty and professionalism in
detailing the Program's targets and the possibility the program might not be funded if the targets
were not met. Ms. Schmidt did not contact these persons identified by Ms. Hirschhorn.

Mr. Zenkus wrote a Performance appraisal for the period of December 2002 to September 2003.
(A copy of the Appraisal is attached as Exhibit "16"). The Appraisal was negative. Mr. Zenkus
wrote:

> Janie is prompt in reporting for work and in submitting regular
> monthly reports and statistical summaries. In her interactions with
> clients, Janie has been observed to exhibit a sense of caring and
> concern.
>
> Janie's work quantity is unsatisfactory as is her initiative.
> Throughout the year Janie has been aware of the need to provide
> intensive case management services to a minimum of 40 youth
> annually. In supervision and via memo, guidelines to meet this
> objective have been offered. Despite this fact, fewer than half the
> required number have been served as of this date.

U.S. Equal Employment Opportunity Commission
July 21, 2004
Page 8

> Ms. Schmidt has demonstrated an unsatisfactory response to
> supervision. Supervisory efforts have repeatedly and consistently
> focused on ways to serve the required number of clients. Despite
> this, she has not met the requirements of the position. She
> apparently has viewed these supervisory efforts as threatening and
> punitive, and as a result has failed to grow in this position.

Ms. Schmidt wrote a response. (A copy is attached as Exhibit "17"). In that
response, perhaps most significantly she wrote:

> One major point that I take issue with is your statement that I have
> met with less than one half of a minimum of 40 youths annually,
> which is inaccurate based on Sanctuary's standards as you have
> explained them to me. You have told me on numerous occasions
> that each of the youths an Independent Living Skills Counselor
> meets with, both on an individual basis and in a group, counts
> towards the 40 youth minimum. Based on that standard, as of
> September 17, 2003 I have met with a total of 49 youths, yet you
> rate me as "Unsatisfactory" in terms of my "General work
> quantity".

(Exhibit 17, second paragraph of page 1).

Ms. Georgiou, Ms. Hirschhorn and Mr. Zenkus met to discuss Ms. Schmidt's situation. They
unanimously agreed that Ms. Schmidt must be terminated for failing to perform the requirements
of her position; especially with respect to meeting the OFCS minimum targets.

Ms. Hirschhorn and Mr. Zenkus met with Ms. Schmidt on September 25, 2003. Ms. Schmidt
was reminded that she had been given information throughout the year regarding the need to
increase intensive case management services to meet the program targets. Ms. Hirschhorn told
Ms. Schmidt she did not provide an indication of making any progress in increasing her intensive
case management services to homeless youth since they had met on September 3. Ms.
Hirschhorn told Ms. Schmidt that her Program had not been meeting the requirements of OFCS
and she was being terminated, or if she so chose, she could resign.

Ms. Schmidt's statement in her rebuttal letter of September 7 that each youth she met with
counted toward the 40 youth minimum established by OFCS was not true nor was she led to
believe that was true.

Ms. Schmidt's complaint focuses on Mr. Zenkus role in her termination. That would appear to
be calculated to support her age claim since he is 39 years old it can be argued he was
discriminating against an older person. However, Mr. Zenkus did not have independent

U.S. Equal Employment Opportunity Commission
July 21, 2004
Page 9

authority to terminate Ms. Schmidt. Rather, Ms. Georgiou had to make the final decision to terminate Ms. Schmidt. Ms. Georgiou reviewed the entire situation with Ms. Hirschhorn and Mr. Zenkus and concluded that Ms. Schmidt should be terminated. Ms. Georgiou is 57 years old.

Ms. Hirschhorn, who had been personally involved in the supervision of Ms. Schmidt, was also of the definite opinion that Ms. Schmidt should be terminated. In fact, it was Ms. Hirschhorn who had first reached the conclusion in April of 2003 that Ms. Schmidt must be terminated, but Ms. Georgiou would not allow her to do so. Ms. Hirschhorn was still of the opinion Ms. Schmidt should be terminated in September of 2003 and, in fact, was the one who told Ms. Schmidt she could resign or be terminated. Ms. Hirschhorn is 58 years old.

## Conclusion

In summary, it is clear that Ms. Schmidt was not terminated because of her age or any complaints of discrimination. Instead, it is clear she was fired because she not only failed but refused to perform a crucial function of her position as an Independent Living Skills Counselor, which is community outreach to homeless youth ages 16 to 21. In order to provide services to these children in desperate need of help, they must first be attracted to the program. Ms. Schmidt refused to do what was necessary. The position is a difficult but important one. Ms. Schmidt knew that when she took the position. Yet, rather than putting her energies toward helping these needy children, she instead spent her time at work making things difficult for her supervisor, for example, the refusal to prepare a report on policy for housing homeless children or even typing it.

The charges should be dismissed.

Very truly yours,

BOND, SCHOENECK & KING, PLLC

Ernest R. Stolzer

cc:     John Leo, Esq.
        Maria Georgiou (Privileged and Confidential)
        Patsy Hirschhorn (Privileged and Confidential)

# EXHIBIT 20

# PERFORMANCE APPRAISAL

NAME: _Janie Schmidt_     PERIOD COVERED: 12/02–9/03

PROJECT/REGION: _SANCTUARY_

POSITION/TITLE: _Independant Living Skills Counselor_     PAGE 1 OF: 2

| AREA OF WORK | UNSAT. | POOR | FAIR | GOOD | excellent |
|---|---|---|---|---|---|
| General work quality | | X | | | |
| General work quantity | X | | | | |
| Ability to work with co–workers | | | | X | |
| Initiative | X | | | | |
| Acceptance of responsibility | | X | | | |
| Cooperation | | X | | | |
| Flexibility | | | X | | |
| Punctuality | | | | X | |
| Professional judgment | | | X | | |
| Ability to learn | | | X | | |
| Task completion | | X | | | |
| Response to supervision | X | | | | |
| Record keeping | | | X | | |
| Ability to work with public | | | X | | |
| Reliability | | X | | | |
| Appearance | | | | X | |
| Organizational skills | | | | X | |
| Leadership ability | | | X | | |
| Frustration tolerance | | X | | | |

COMMENTS:
(See attached Page 2)

I understand that my signature represents receipt of this appraisal and that I am entitled
to make a part of the record any written comments. This signed appraisal (with or without
comments) is to be returned to my supervisor by the end of the workday:

**EE0187**

See attached detailed
response

_Jane Schmidt_
Signature of staff member

Date: 9/17/03

_Cathy R Stein_    05
Signature of Supervisor

Date: 9/17/03

PAGE 2 OF 2

<u>Evaluation Comments for Janie Schmidt, Independent Living Skills Counselor:</u>
*9/17/03*

Janie is prompt in reporting for work and in submitting regular monthly reports and
statistical summaries. In her interactions with clients, Janie has been observed to exhibit
a sense of caring and concern.

Janie's work quantity is unsatisfactory as is her initiative. Throughout the year Janie has
been aware of the need to provide intensive case management services to a minimum of
40 youth annually. In supervision and via memo, guidelines to meet this objective have
been offered. Despite this fact, fewer than half the required number have been served as
of this date.

Ms. Schmidt has demonstrated an unsatisfactory response to supervision.  Supervisory
efforts have repeatedly and consistently focused on ways to serve the required number of
clients. Despite this, she has not met the requirements of the position. She apparently has
viewed these supervisory efforts as threatening and punitive, and as a result has failed to
grow in this position.

EE0188

EXHIBIT 21

# Memorandum

**To:**   Janie Schmidt

**CC:**   Maria Georgiou
          Patsy Hirschhorn

**From:** Anthony Zenkus

**Date:** 4/21/2003

**Re:**   Memorandum of Warning

---

Your failure to perform street outreach as scheduled on the afternoon of 4/15/03 is of great concern. I fully expect that the staff of Project Sanctuary will follow all assigned tasks. Please be advised that you cannot pick and chose which assigned tasks you perform. Street outreach is a function included in your job description, and your acknowledgement of that and subsequent refusal to perform it that afternoon, despite my directive to do so, is insubordination.

I fully expect in the future that you will perform all duties assigned to you in the manner required.

Your failure to do so may result in further disciplinary action up to and including termination.

I understand that my signature is required and represents receipt of this memorandum.

_Jane Schmidt_   **Employee signature**

_4/21/03_   **Date**

My Signature acknowledges only that I have received this evaluation.



1

125

# EXHIBIT 22

# Janie E. Schmidt

Four Oxbow Court
East Northport, NY 11731
631.368.7611

May 8, 2003

Ms. Maria Georgiou
Executive Director
Huntington Youth Bureau
423 Park Ave,
Huntington, NY 11743

Dear Ms. Georgiou:

I am writing this letter after speaking with counsel, to respond to a memorandum I received from Anthony Zenkus on April 21, 2003. Specifically, I am writing both to express how unfair and misleading Mr. Zenkus' memorandum is, and to complete the picture by describing the context in which the memorandum fits within the history of abuse and harassment by Mr. Zenkus since he became the project director of Sanctuary in December, 2002.

Beginning almost immediately after Mr. Zenkus started at Sanctuary, his tone and language toward me have been demeaning and hostile, and I quickly began to feel as if I was being treated differently than other, younger employees with whom Mr. Zenkus seemed to have a more friendly relationship. On January 29, 2003, Mr. Zenkus placed a memorandum in my mailbox, a copy of which was also sent to Patsy Hirschhorn. The memorandum provided a job description for my position as Independent Living Skills Counselor, as well as an identification of my job duties and the dates on which certain tasks must be completed. Mr. Zenkus never spoke to me about the subject matter of this memorandum prior to placing it in my mailbox and, at the time, I was the only person in the project to receive such a memo.

I became extremely upset and felt that I was being singled out by Mr. Zenkus. Since Patsy Hirschhorn was copied on Mr. Zenkus' memorandum to me, I felt I could discuss the situation with her. I told Ms. Hirschhorn that I was offended at being the only person to receive Mr. Zenkus' memorandum without prior discussion, and also by the tone of the memorandum and the way Mr. Zenkus spoke to me generally. I subsequently learned that Mr. Zenkus wrote a joint memorandum one week later to the other project members, and he spoke individually with the other members prior to sending their memoranda. I also learned that he told the other members that the task dates were only "targets", and that he required only that they make an effort to meet the task dates. Ms. Hirschhorn said that she would speak with Mr. Zenkus about my concerns.

The very next day, Mr. Zenkus called me into his office. As soon as I walked in, he sat back in his chair and threw his pencil on his desk. Mr. Zenkus stated that he was furious at me, and warned me never to speak with his superiors about him again. He then asked me if I heard and understood what he just said, and continued to badger me until I began to experience a rapid heartbeat and feel physically uncomfortable. I stood up at that point, explained my discomfort, and said that I had to leave. Mr. Zenkus responded by demanding that I sit down. I told him that I couldn't sit down because I was experiencing a rapid heartbeat as a result of his angry and threatening tone, but he nevertheless stared at me and stated, "I said sit down." Feeling ill, I had to leave his office.

EE0182

Ms. Maria Georgiou                          -2-                          May 8, 2003

This was not the first time that Mr. Zenkus had exhibited animus toward me, or had spoken to the staff in our office in a demeaning manner. He would frequently say "I am the director and I direct", refer to himself as "The Boss", and further state that the office staff was not permitted to talk among themselves about issues of concern, even though I understand that such a prohibition is contrary to prevailing employment laws.

On February 14, 2003, Ms. Hirschhorn, Mr. Zenkus and I met to discuss what had transpired in his office a couple of weeks earlier. I told Ms. Hirschhorn about the hostility and disparate treatment Mr. Zenkus had been demonstrating toward me, and that he had warned me not to speak with his superiors again. Mr. Zenkus stated at the time that he wanted to place a memorandum of warning in my file, but Ms. Hirschhorn stated that such a memo was not necessary and "would only accumulate dust". After that meeting, Mr. Zenkus' tone and demeanor toward me deteriorated, in apparent retaliation for my speaking with Ms. Hirschhorn and her refusal to permit Mr. Zenkus to place a written memorandum in my file.

During the first week of April, 2003, I had a supervision session with Mr. Zenkus. We discussed having me do street outreach, at which time I mentioned that Mary Lou Kallman (the grant writer) had previously told me that street outreach was never meant to be done alone because it was considered potentially dangerous. Mr. Zenkus told me that he wanted me to do street outreach, but since there would be times I would have to do it alone, he would investigate whether there were any policies against that practice. I understood at the end of our supervision session that Mr. Zenkus would look into this matter, and that we would discuss it further at a subsequent session. Mr. Zenkus never gave me even the slightest indication or warning that I was being insubordinate.

Nevertheless, on April 15, 2003, Mr. Zenkus placed a memorandum of warning in my file. This memorandum came as a complete surprise to me, given what I felt was an amicable discussion about street outreach. It is now clear to me that Mr. Zenkus was setting me up during our supervision session to come up with a reason to place a warning memo in my file, after Ms. Hirschhorn previously did not allow him to do so. Mr. Zenkus' April 15th memo and his behavior toward me is consistent with his general hostile treatment and his attempt at retaliation for my complaints to other supervisory officials at Sanctuary.

When I subsequently spoke with you on April 23rd, you described the nature and extent of street outreach that you considered to be safe and appropriate, and that you expected me to be able to perform those duties alone if necessary. I agreed that your definition of street outreach was reasonable, and I expressed my willingness to perform those duties and continue to try to work with Mr. Zenkus. I also asked that you remove Mr. Zenkus' April 15th memo from my file, and you said you would consider my request.

Maria, I am very disappointed at your decision to allow Mr. Zenkus' April 15th memorandum to remain in my file. I have worked hard for the past 12 years to earn my reputation and to have a personnel file of which I am proud. I certainly do not want to further ignite any hostile feelings Mr. Zenkus already has toward me, and I am fully prepared to continue to work with him as long as his abusive, demeaning and retaliatory behavior stop.

Sincerely yours,


Janie E. Schmidt


cc: Ms. Patsy Hirschhorn
    Janie Schmidt's Personnel File


EE0183

EXHIBIT 23

# PROGRAM ANNUAL REPORT

## (See instructions on reverse)

State of New York
OFFICE OF CHILDREN AND FAMILY SERVICES
Form OCFS3140(Front)(Rev 9/98)

Sponsoring Municipality: T HUNTINGTON          Program Code: 03471750H013   Fund: RHYAI

Implementing Agency: HUNT YTH BUR-YTH DEVEL RSCH INST
Program Title:   SANCTUARY FAMILY SOCIAL WORKER
Agency Address: 423 PARK AVE., HUNTINGTON, NY  11743

Contact Person:  ANTHONY   ZENKUS          Title: PROJECT DIRECTOR
Telephone Number:  (516) 271-2183

## PROGRAM SITES

| Type | Address | Assembly District | Senate District | Local Plng Board | City Council District |
|------|---------|-------------------|-----------------|------------------|------------------------|
| OFFICE | 423 PARK AVENUE HUNTINGTON  11743 | 9 | 2 | | |

## PROGRAM PROFILE

|  | Problem/Need | Target | Service Methods | Number of Youth to be served | Unduplicated Count |
|--|--------------|--------|-----------------|------------------------------|--------------------|
| Primary | 722 | 713 | 560  524 | 40 | 40 |
| Secondary | | | | | |

**STATISTICAL REPORT:** Use only Whole Numbers. Do NOT use Percentages.
_____ No direct services provided to youth.

Unduplicated Number of Youth Served: ___35___
Gender: Male __14__     Female __21__
Ethnicity:  White __21__     Black __8__   Hispanic ___5___   American Indian __0__
Asian __1__     Other __0__
Age: 0 - 4 __0__     5 - 9 __0__     10 - 15 __24__   16 - 20 __11__

Narrative attached as per instructions on Reverse:  Yes _x_   No ____

**MONITORING** - Describe the methods used to monitor this program during the reporting period. Include who conducted the monitoring, when it was conducted, and how the results were used. (Attach additional page if necessary).

Hirschhorn EX# 26

PREPARED BY: _Anthony Zenkus_          TITLE _~~Project Director~~_ DATE 2/2/04
Signature of Program director or designee

CERTIFIED BY: _signature_          TITLE _Ex Dir._ DATE 2/3/04
Signature of Chief Executive Officer
(or designee), or Agency Executive Director if direct contact

1206

ANNUAL NARRATIVE REPORT

PROGRAM YEAR:  2003

AGENCY:  HYBYDRI SANCTUARY PROJECT –FAMILY SOCIAL WORKER

1.  MAJOR PROGRAM ACCOMPLISHMENTS OF THE PROGRAM YEAR,
    INCLUDIING STATUS OF OBJECTIVES LISTGED IN THE
    CONTRACT.

In 2003, the Sanctuary Family Social Worker provided intensive youth and family
counseling to 35 runaway, homeless and at risk youth and their families.  Scheduling and
initial appointments were expeditiously arranged with the flexibility of day, late
afternoon or evening appointments in order to accommodate family needs.  If youth
and/or families were in crisis, the Family Social Worker met with the family as often as
necessary to resolve the crisis situation.  The Family Social Worker facilitated a Parent
Support Group.

The Parent Support Group (PSG) continues to provide support and enhance parenting
skills.   Parents who desire support and whose children are not ready for family
counseling are able to join the PSG and gain insights and support they need. Supporting
the youth and the parent separately often facilitates the communication to commence
family counseling.   Parents are encouraged to join this group early in their family's
involvement with Sanctuary in order to have greater impact on their relationships with
their children.

The Family Social Work of Sanctuary Project has been enhanced by the Parenting Skills
Training Program that is funded through other resources.  The objective of this program
is to be educational and to assist parents in their search for knowledge regarding various
aspects of this complex, at times overwhelming, wonderful occupation of raising
children.

The Parenting Skills Training Program provided workshops to parents of diverse ethnic
and socio-economic status from all areas within the Town of Huntington.  An additional
218 parents received assistance as they work toward their goals of raising children to take
their  place in society as loving, responsible, valuable adults who themselves will most
likely continue the cycle of parenting.

The Family Social Worker remains available to the Huntington Youth Bureau System for
consultation.

2.  DESCRIBE  ANY OBSTACLES OR PROBLEMS THAT OCCURRED
    DURING THE PROGRAM YEAR, HINDERING PROGRESS TOWARDS
    PROGRAM OBJECTIVES.   INCLUDE DISCUSSION OF STEPS TAKEN
    OR PLANNED TO OVERCOME THOSE OBSTACLES.

The Family Social Worker position had a zero caseload when the new counselor took the position in Oct. of 2002. The program did well in building up a new caseload of teens and families who need the specialized services provided by this program within Sanctuary. Increased collaboration with the Runaway Counselor was encouraged so that numbers of clients reached could be increased and services provided could be better coordinated.

It continues to be noted that there is an increase in the severity of problems observed in Sanctuary families. Often, youth come in for runaway/homeless crisis services. Because of the severity of dysfunction, immediate issues are first addressed and require more interventions and counseling for the youth. Individual work must be done to prepare and encourage family participation in family counseling. This has impacted on the number of cases participating in intensive services.

Despite the best efforts of the program, there are still adolescents throughout the community who have yet to be made aware of the services available to them through the Family Social Worker. An increase in outreach on the community and school levels has been instituted to ensure that any eligible youth or family in need is being served. This heightened level of outreach will continue throughout the coming year.

### 3. LINKAGES AND WORKING RELATIONSHIPS INITIATED OR CONTINUED, GIVING A SENSE OF THE VALUE OF THESE DESCRIBE LINKAGES.

The Family Social Worker maintains linkages with support systems in the community to provide reunification of the family. Most of the family cases require advocacy and case coordination with other service providers. These connections are essential as they ensure continuous communication and collaboration between the Family Social Worker and other service providers in order to more effectively assist these youth and families.

The Family Social Worker established a valuable linkage with the Womens' Center in Huntington. An announcement has been printed in the Womens' Center Newsletter letting community members know of the Family Social Worker's services. Linkages with Child Protective Services were strengthened resulting in enhanced contact and information sharing.

Huntington Sanctuary is a part of the Town of Huntington's comprehensive youth service system.. Families are often involved in several different Projects of the Huntington Youth Bureau System.. Through Sanctuary's case coordination and liaison relationships with the three Regional Community and Youth Agencies, the work with these families becomes managed in such a way as to maximize their involvement and to promote consistency from service providers.

## 4. NOTE AREAS OF TECHNICAL ASSISTANCE THAT WOULD BE BENEFICIAL TO THE OPERATION OF THE PROGRAM.

Staff training and travel currently comes from fund-raised or non-OCFS agency income. In order to maintain the level of professionalism and expertise to serve these youth and their families, ongoing education through trainings, workshops and seminars are a necessity. It has been noted that trainings that specifically address Family Social Work are costly and often beyond the financial means of Sanctuary. An increase in funding to cover the cost is needed.

Over the course of the program year, several reports to various agencies are required. Much time is spent in retrieving data for the purpose of reporting. It would be helpful if the various agencies would review various reporting requirements and adjust categories or develop a data entry system which would compile, sort and generate information as needed for various reporting.

Since many residents of the Town of Huntington are Spanish speaking, it would be beneficial to have the Family Social Worker trained in Spanish so that these clients may be better served. The expense of specialized language training is high and taking the funds from the training budget line would further deplete what monies are set aside for trainings. Funds to offset this expenditure would be greatly beneficial.

# VOLUNTEER LIST FOR HUNTINGTON SANCTUARY

## 2003

Janet Andriano

Christine Biernacki

Dave Biernacki

Bill Farrell

Charlie Hoehlein

Jack Jerdan

Joanne Lombardi

Sara Manning

Christine Matis

Jill Sitterley

Lindsay Turan

EXHIBIT 24

# Huntington Sanctuary

# Memo

**To:** Janie Schmidt

**From:** Anthony Zenkus

**CC:** Patsy Hirschhorn

**Date:** 9/3/2003

**Re:** Typing

---

As per our supervisory session of 8/27/03 when you stated that you could not type, I am reminding you that you need to acquire a basic typing tutor program that will enable you to learn how to type, as required in your job description. You need to bring the program to work with you by our next supervision session, which will be 9/5/03 at 11am.



PLAINTIFF'S EXHIBIT
ZENKUS 31
7/12/06

1

# EXHIBIT 25

STILS---1996
## PROCESS OBJECTIVES:

1. Provide intensive case management services to 30 older adolescent homeless youth .

2. Assist 10 other homeless, 16 to 20 year-old youth with short term crisis intervention services.

3. Provide training in independent living skills,problem-solving, decision making and
   communication skills for at least 50% of these 30 older adolescent  clients.

4. Provide street outreach to engage with this hard to reach population.

5. Provide mobile youth counseling to youth on the street.

6. Provide weekly counseling and support group for pregnant and parenting teens with Planned
   Parenthood and Tri-Community Youth Agency.

7. Maintain linkages and strengthen existing connections with at least 10  agencies and systems
   that provide services to homeless youth.

8. Advocate for homeless youth population and accessibility of appropriate services with at least
   5 existing community groups and county-wide coalitions (eg. CORPS, Nassau/Suffolk
   Coalition for the Homeless and Sanctuary Advisory Board Youth Housing Task Force).

9. Coordinate efforts to identify, engage and refer homeless youth through work with 15 local
   Community and Youth Agencies, community schools, agencies, and local church groups.

## OUTCOME OBJECTIVES:

1. 30 older adolescent homeless youth will demonstrate skills to foster stabilization and will utilize
   their skills for survival in a more productive direction as measured by observation, self
   report, case notes and/or interview.

2. 10 other homeless 16 to 20 year old youth will display an understanding of alternate community
   resources that are available to them as measured by observation, interview and/or self
   reports.

3. At least 15 youth involved in independent living skills,problem-solving,decision making and
   communication skills training will demonstrate a knowledge of how to advocate and
   negotiate systems without need of intensive case management services.  This will be meas-
   ured by observation, interview, self reports and/or case notes.

14

4. Youth involved in the  weekly counseling and support group for pregnant and parenting teens will achieve increased self awareness and parenting knowledge. This will be measured through participation and attendance in Teen Mom's Support Group and by observation, self reports, interviews and/or program narratives.

5. Because of the linkages and advocacy with other agencies and organizations providing services to this population, service delivery time and coordination of  services will be expedited in an efficient and time-effective manner as measured by case notes and project stats.

6. The CYAs, other Institute Projects and other organizations and agencies will demonstrate their ability to identify, engage and refer appropriate youth by referring 10 homeless youth to STILS.

15

EXHIBIT 26

- When Mr. Zenkus ( referred to in this document as "Supervisor") became director of Sanctuary in December 2002, he began planning with his supervisor Ms. Hirschhorn to strategize ways to address the low numbers of clients being served in relation to our contracts with New York State and the Federal Government. The action plan for improving numbers at Sanctuary included increased school and community outreach, increased accountability, and a directive that staff must do intensive case management with groups to maximize client numbers. From the beginning, Ms. Schmidt responded to these directives with resistance. Ms. Schmidt questioned the need for 2 school and 2 community youth agency outreaches per week, (even if staff had to take a day off) saying that "there wasn't enough time". At that time Ms. Schmidt had one client.

- All staff were directed to plan to do at least one group. Ms. Schmidt suggested running a group at the TRi-CYA in South Huntington which would meet 2 times. The supervisor informed her that that would be considered a presentation, and that a formal group must meet a planned number of sessions (usually at least 8) in order to count as a group. At the time, Ms. Schmidt's caseload was very low and she had no established plan to raise the numbers. Ms. Schmidt also expressed resistance regarding the directive of submitting a planned outreach/work schedule on Fridays for the upcoming week, askin why this had to be done and saying she preferred to do it on Monday's. On 1/29/03 a memorandum was placed in Ms. Schmidt's mailbox detailing what is expected of her program regarding group work. This memo also outlined what her caseload needed to be, how much outreach had to be done, and reminded her that weekly schedules needed to be submitted on the afternoon of the Friday before the schedule is dated. The memo stated "If you have any questions on how to implement these things, or need help in any way, please make the time to meet with me so we can discuss ways of ensuring these outcomes." Upon receipt of this memo, Ms. Schmidt immediately questioned other staff to see if they had received a similar memo, and after learning they had not, went to Mr. Zenkus' supervisor Ms. Hirschhorn and complained that she had been singled out.

- The next day, the Supervisor called Ms. Schmidt into his office and informed her that she did not follow the directive of the memo and should have spoken to the supervisor if she had any questions. Mr. Zenkus informed Ms. Schmidt that in the future she needs to speak to him first if there are any questions or concerns (as was expressed clearly in the memo), and that she was not to question and upset other staff, including supervisor's, before following procedure and gaining clarity from the supervisor. The supervisor directly asked Ms. Schmidt if she understood what was expected of her so that it would be clear that both parties understood what was going on. The supervisor asked Ms. Schmidt where her weekly schedule was, which had still not been submitted from the week before. She informed the supervisor that it was on her desk. The supervisor questioned why the schedule, which was for the week of January 27, and which was to have been submitted on the Friday prior to that week (which was Jan. 24) was still not submitted. The supervisor reminded Ms. Schmidt that the memo of Jan. 29 expressly indicated when the schedules need to be submitted, and questioned Ms. Schmidt as to

1



PLAINTIFF'S EXHIBIT ZENKUS 34 7/12/06

184

why these directives, both verbal and written, had yet to be followed. The supervisor asked Ms. Schmidt where the schedule was and she responded that it was on her desk and she had not submitted it yet.  Ms. Schmidt suddenly stood up and began to leave the supervisory session.  The supervisor questioned where she was going and Ms. Schmidt responded that she was going to get the schedule, and the supervisor said that the supervisory session had not ended and that she could get the schedule after.  Ms. Schmidt continued to walk toward the door, and Mr. Zenkus asked her to sit down and reminded her that the session was not over, and Ms. Schmidt refused.  Ms. Schmidt then told Mr. Zenkus that her "heart is going like this" and made a motion referring to an excited heart beat, after which Ms. Schmidt ran out of the room.  Ms. Schmidt did not express to the supervisor or to any administrators that she was ill, and continued to work the rest of the day, including driving to Northport High School to do assigned tasks.

*       The other two project counselors had indicated that they understood what type of groups they had to run, and were already in the planning phase of beginning preparation for groups that would meet the needs of the program and its clients.  The other two project staff offered no resistance to that directive, and one of the two staff asked if it were possible for her to run more than one group.

*       Approximately two weeks later, Ms. Hirschhorn and the supervisor met with Ms. Schmidt in the supervisor's office to discuss things further with Ms. Schmidt.  A letter of warning dated 2/14/03 had been written and was to be given to Ms. Schmidt expressing concern for her lack of professionalism.  During the meeting it became apparent that Ms. Schmidt seemed to express an understanding of the situation and a desire to work together with the supervisor to meet the program's goals. The supervisor then asked Ms. Hirschhorn if it were necessary at this point to give the letter of warning to Ms. Schmidt, and Ms. Hirschhorn said it was not. The supervisor agreed and the letter was not presented to Ms. Schmidt or put in her official file.

*       In the first week of April, 2003, Ms. Schmidt was directed to perform street outreach, as per her job description, and she refused.  Before ending the brief meeting with Ms. Schmidt, the supervisor said " I just want to be clear that I have asked you to do the outreach and you have refused" and Ms. Schmidt left, not having performed the assigned task.  There is no policy that states that outreach must never be performed alone, and there is precedent within the Huntington Youth Bureau system that street outreach is often performed alone, as is the case in Youth Directions and Alternatives and the TRI-CYA.  On the afternoon in question, a sunny, mild afternoon, it was suggested to Ms. Schmidt that she go to Huntington Village and perform the street outreach, but that she had to perform it that day either way.

*       The supervisor placed a memorandum of warning in Ms. Schmidt's file stating that Ms. Schmidt was insubordinate for failing to perform street outreach as required in her job description.

*       After Ms. Schmidt's letter responding to the memorandum of warning dated May 8th,  the supervisor made a sincere effort to leave these incidents in the past and focus on the work that needed to be done to meet the requirements of Project Sanctuary's contracts.  The supervisor spent hours in supervision with Ms. Hirschhorn discussing ways to cultivate a more positive work atmosphere and to improve staff motivation. The supervisor congratulated all the project staff for their hard work in the planning and implementation of the Spring Open House.  In June, the supervisor took all of the project

staff out to lunch to thank them for all their hard work over the year, and for the open house. Ms. Schmidt on more than one occasion thanked the supervisor for the lunch, saying it was a very nice gesture. This was not the only conversation with pleasant and lighthearted tone that took place between the supervisor and Ms. Schmidt between May 8th and the time of her termination.

●  During the first week of August the supervisor told Ms. Schmidt that she needed to visit the Onesti Hotel so that potential clients would get to know her and utilize her services. In front of other staff, Ms. Schmidt said that she didn't want to go meet clients at the hotel and that other options should be considered. The supervisor said that other options such as meeting clients at a diner were good, but that there had to be contact at the hotel in order for those meetings to occur. Ms. Schmidt reiterated that she didn't see why she had to meet client's at the Onesti Hotel, and the supervisor reminded her that that is the population she is required to work with as per her job description. The supervisor gave Ms. Schmidt a detailed memo outlining what she needed to do as per the Onesti Hotel population. Instead of utilizing the content of the memo as a roadmap to improve her client contacts and numbers of clients, Ms. Schmidt responded that that memo was "the most controlling thing she had ever received." The supervisor reiterated that the work must get done. In preparing to give Ms. Schmidt a detailed and useful set of instructions on what needed to be done at the Onesti Hotel, the supervisor contacted Clara, the Hotel Worker from the Tri-CYA, to determine in what capacity Ms. Schmidt could be involved with the hotel population. At a staff meeting on August 19th, Ms. Schmidt said to the supervisor that he should not call workers from other projects or agencies and make arrangements for Sanctuary Staff. Ms. Schmidt said that behavior was controlling and unwanted.

●  On August 25, 2003 the supervisor told Ms. Schmidt that he wanted her to compose a draft outlining the project's policy regarding placement of runaway's in host homes. It was determined in a meeting with Ms. Hirschhorn that since Ms. Schmidt was at Sanctuary the longest of all the direct service staff, she would have more knowledge of the history of placement policy and would be able to be most helpful on this project. Initially, Ms. Schmidt said she didn't think she should do it and that one of the other staff should. The supervisor told Ms. Schmidt that she was responsible for this particular project and he expected her to complete it, with help from other staff as necessary. On August 26, 2003, the supervisor left a note for Ms. Schmidt saying that he needed the policy by Thursday of that week. Ms. Schmidt told the supervisor that another staff member, Jennifer Grosser, had the policy and she (Ms. Schmidt) would work on it the next day. On August 27, 2003, the supervisor asked Jennifer Grosser who did most of the bullet point policy and she indicated that she did. The supervisor asked Ms. Grosser if she understood it was Ms. Schmidt's assignment and she said yes. The supervisor asked Ms. Grosser why she did more than she was asked to do when it was Ms. Schmidt's assignment and she said "I don't know", and indicated that she, Ms. Grosser, had already done most of it. Later that afternoon, in front of other staff, the supervisor asked Ms. Schmidt to type the policy up for him so that he may deliver it to Ms. Hirschhorn. Ms. Schmidt refused and said "I don't type". After that, in a supervisory session with Ms. Schmidt, the supervisor asked for clarification on Ms. Schmidt's "I don't type" statement. Ms. Schmidt indicated that she did not know how to type and had never learned. The supervisor told Ms. Schmidt that being able to type was part of her job, and that she

3

should acquire a typing tutor software program for the computer and she would be able to use work time to practice. At a later meeting that week, Ms. Schmidt said she did not need to get a typing tutor program because she was not unable to type, and that she did not know how to type on the computer. The supervisor responded that using the computer was a job requirement, and that in her signed job application Ms. Schmidt had indicated that she was proficient with the computer. Ms. Schmidt responded by saying that she "never signed anything like that" and demanded to see that application. The supervisor asked Ms. Schmidt why, if that were the case, she did not type up the policy as directed, since there was both a computer and a standard typewriter in the office. The supervisor also asked Ms. Schmidt why she said that she didn't and couldn't type one day, then later said that that wasn't the case. After some time of not getting answers, the supervisor responded that he was "thoroughly confused" and did not know what Ms. Schmidt was able to do regarding typing or using Microsoft Word or other word processing programs. The supervisor did not mock MS. Schmidt, but merely asked for clarification and straight answers, and expressed concern whether Ms. Schmidt had the skills necessary to perform some of her job functions. When asked how Ms. Schmidt had been able to type documents up during her tenure at Sanctuary, Excel, and Enterprise, Ms. Schmidt said that she "had other people do it for her". Mr. Zenkus reminded Ms. Schmidt that sometimes secretaries and other staff may be busy or unavailable, and that she would have to be able to type up documents on her own at times. (see enclosed note entitled "follow up meeting" dated 8/29).

* A memo was given to Ms. Schmidt dated 9/3/03 outlining what she was expected to do regarding working on her typing skills. Ms. Schmidt did not acquire a typing program as directed, and did not follow through on what was asked of her in her supervisory meetings.

* Ms. Schmidt's performance evaluation dated September 17, 2003 was factual and represented accurately Ms. Schmidt's performance at the Sanctuary Project.

* On September 25, 2003, at a scheduled meeting with Ms. Hirschhorn, the supervisor, and Ms. Schmidt, Ms. Hirschhorn informed Ms. Schmidt that her program had not been meeting the requirements of its contract and that Ms. Schmidt would no longer be employed at Sanctuary.

* Although Ms. Schmidt was instructed to gather her belongings and leave the office in a timely manner, she instead took over an hour to do so, engaged in a lengthy conversation with another staff member who became visibly upset and had to cancel a counseling appointment with a client due to her emotional state (not sure there is documentation on this but employee may verify). Ms. Schmidt returned the following morning and continued to talk with other employees on the third floor about what had happened to her, and took a very long time to gather her things. Eventually the head of personnel had to escort her from the building.

# EXHIBIT 27

# Memorandum

**To:** Patsy

**From:** Lizabeth Graeve & Jennifer Grosser

**Date:** 10/2/2003

**Re:** Meeting of Concerns

Here is a list of concerns that we have composed:

1- Concern that actions have not been taken at the administrative level.

-Issues with Supervisor

-Interpersonal staff/project relations

2- In the past numbers have been low in all positions but no action was taken.

3- Scheduling and coverage issues.

4- Work atmosphere/Environmental concerns.

-Concerns regarding a lack of group cohesion, teamwork, and less room for learning and growth within the project.

- Set-up for failure- Instead of looking at the position as a whole it seems as though great emphasis is being placed on the person in the position.

- Emotional needs of employees to enhance and increase productivity.

5- Professionalism and boundary issues.

- disclosing personal info.

6- Different treatment amongst employees.

7- Who will perform and take over the tasks of the position?

8- Job security.

9- Youth development hindered.

-Energy being spent on negativity.

**EEO349**

[Numerous handwritten annotations throughout the margins, partially legible:]

Patsy
2- hire mid-November
3- job issue not an issue as per Patsy
4- can't believe it is not solved "& I'm so angry"
5- get on board & grow apart
6- LS never did what it was supposed to
7- Life sucks

① different personalities but we all react the same - 3 full-time professional staff

→ inability to give up control
→ no mediation occurred - no Patsy intervention
→ examples from past → "I'm the director" → doesn't listen to us

can't rely on what we planned - can't does much - outstation - outreach

↓ looked through the books & each positions #'s have dipped → LS, 2 groups this year

- hostile environment build around sarcasm + tension which leads towards less room for growth
- coworkers coming out of supervision crying
- age discrimination

can't use the words UNCOMFORTABLE SCARED. Afraid to ask questions

afraid to take risks + ask questions b/c uncomfortable talking to supervisor

✱CONFUSION✱

sitting us down + saying LS position is in jeopardy - what can we all do to help

• Cycle of violence
• mixed feelings about supervisor
• difficult - want to say we hear your concerns but didn't have addressed
• during supervision drift off to personal topics

- exact employers in there on a seemingly casual basis - in a professional role one minute + then hanging out w/us the next

- no peer supervision
- no talking amongst employees
- memoing + some talked to

✱these have been issues since the beginning + they have been addressed by Janine & they continue to be issues friend got fired + these are still the problem. nothing is new + nothing has been done about it.

✱5 referrals for Janie this week ✱ position vacation now to get #'s

no atmosphere to open up & learn.
-made this a hard place to work
- trickle down effect to clients - can't go to supervisor for so do

✱no intervention done the 1st time so now what are you going to do??

EX #75

5- professionalism + boundary issues
     - dir. discloses too much personal
      info to ~~staff~~

Jen
       (girlfriends, going out every night)
     - mixed feelings about supervis(r)
     - acting like our friend /other times → boss   professional + creates confusion
     - happy hour, going out, band
    * issues that were supposed to be
resolved 10 mths ago.
        * Janine said she would deal w/
       boundaries but didn't.
     * supervision - times when personal stories
    discussed instead of focusing on clients/
    clinical.
     - hanging out w/our peers (Excel)
    during + after work) casual basis
   ← Denim Jacket example

6- diff. treatment
      - Janie always memoed → singled out
       (Jen + Liz explanations)
         - Outreach memo
Liz
         - fair on explained evaluation
      - host home assignment → Jen helped
       + Janie got in trouble but
     Jen + Liz have placed kids.

**EE0350**

   - divide & conquer mentality →

- no peer supervision
- no talking amongst employees
- other project staff members not allowed over

7 cycle of violence
      attack
      honeymoon phase
      tension building

7- tasks of the position
gvt     - RI meetings
     - DSS meetings
    - what to do w/client b/w 16-21
    - 4 calls this week for ILS
    - have to get #'s w/vacant position
       could have had 9 clients this week.

8- job security
U3

9- youth develop.
Jen    - not happy @ work → atmosphere not
    conducive to learning + trickles down
    to client.          **EE0351**
    - client suffers
    - last person to go to for advice is
    supervisor.

4- work atmos / enviro concerns
- not being able to say the word
  uncomfortable or scared
why - director should question + understand
  what is behind these feelings
- left workers unable to discuss true
  concerns / feelings
- afraid to ask ques → resistant
  questioning authority
- afraid to take risks / ask questions
- hostile work environ. → sarcasm &
  tension lead to less room for growth
  as an indiv. / + project
- employees crying after supervision.

gen   emotional needs
         Janie having anxiety attack

set up for failure → back up plan
    - low #'s better solved as a group problem
    - how can RSW / FSW help ILS counselors
    - look @ client you are targeting → ILS
      position, look deeper @ position → goals
      & objectives (are they realistic + attainable)

**EE0352**

1- Concerns that actions have not been taken
      at the administrative level
            - inability to give up control (calling regions)
ὑς      - not listening
            - being told what to do   *pad ev
            - "cl'm the director"
            - staff spoke w/ Janine → no mediation

2- cln the past #'s have been low
            - all positions had ↓ #'s in past
            - why hasn't the project looked more closely
                  (admin /super/ dire.)
Jen               (in order to increase #'s)
            - no action taken against prior employees
                  repercussions
                  (1 LS → 2 gpo. )

3- scheduling / coverage issues
            - FSW/RSW need to be present a office to
            answer phones / deal w/crisis
            - less time for outreach /schools/regions
Jen      - originally → came up w/plan →3 wkrs in Reg. coor
                  Tues - Jen out
                  Wed - Liz out                    **EE0353**
            - 3 co's present →we could be getting more
                  work done/ helping more kids



1 - Actions not taken at the administrative level.
- Issues w/ supervisor
- Interpersonal staff/project relations
- lack of intervention/ mediation
(anthony, Patsy, Janine)
(concerns continue to exist)
— emotional needs of employees
— struggle w/ boundaries & professionalism

ADD
- IN #2

2. Set-up for failure → instead of looking at the position as a whole, everything was focused on the ^individ. not the^ position
- what could be done to serve the needs of the project + clients
* getting group together to ask how to help Janie.

3. #'s were low, but now the position is vacant for a month +
- no one to get #'s
- need to establish school + community leads.

4. Scheduling + covering issues.

5. Who will take over the tasks of the position?

EE0354

2. O. Work atmosphere/environment concerns.
   - hostile worke envir, afraid to bring up thing — afraid to
     created atmos that is detrimental to us           take risks
     lack of trust & that it won't be us
   - Different treatment amongst employees.

   - job security

   - singling out → divide & conquer mentality
                  → mental health of employees

O - Emotional needs of employees.

11 - ▓ Struggling w/ boundaries + professionalism

10 - Youth development hindered.
     - energy being focused on negativity
       but lack of motivation + ambition.

12 - Throughout the past several 10 months,
     there have been many issues
     but the have not been dealt
     w/on an administrative level.

   Where do we go from here.

          Family
          System
          Theory

                    fair means
                    average
                    "I told
                    the 9/1 25"

EE0355